Albert L. LUCE, Jr., Frances C. Luce, George E. Luce, Willouise B. Luce, Joseph P. Luce and Marilyn S. Luce

v.

The UNITED STATES.

No. 519–81T.

United States Claims Court.

Dec. 13, 1983.

Theodore M. Forbes, Jr., Atlanta, Ga., for plaintiffs; Robert D. Strauss and Gambrell & Russell, Atlanta, Ga., of counsel.

Israel D. Shetreat, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

OPINION *

PHILIP R. MILLER, Judge:

This is a suit for refund of gift taxes paid with respect to gifts of stock of the Blue Bird Body Company, made in 1976 by the three Luce brothers, Albert L., Jr., George E. and Joseph P., who are the controlling stockholders of that company. On September 30, 1976, Albert gave 19,000 shares to a trust for his daughter. Thereafter, on October 29, 1976, Albert gave 2,000 additional shares directly to his daughter, and George and Joseph each gave 38,000 shares both directly to members of their families and to trusts for their benefit. There were a total of 16 gifts, consisting of 97,000 shares, 83,000 of which were in nine trusts with a common trustee, the Citizens and Southern National Bank of Macon, Georgia. The 97,000 shares represented 17 percent of the total of 582,000 shares which were outstanding.

Each donor filed a gift tax return valuing the shares at $39.31, which is equal to their book value as of September 30, 1975, the end of the prior fiscal year.

---

* Since all of the pertinent findings of fact are contained in this opinion, pursuant to Rule 52(a) no separate findings will be filed.

After filing appropriate claims for refund, plaintiffs[1] brought timely suit and now claim that the fair value of the gifts should more properly have been computed at $26 per share.

The Blue Bird Body Company was founded in 1927 by A.L. Luce, Sr., plaintiffs' father. By 1947 its shares were owned one-fourth by A.L. Luce, Sr., and his wife, and one-fourth by each of the three plaintiffs. Plaintiffs' father died in 1962, and by 1966 the three plaintiffs had acquired 100 percent of the shares.

Starting in 1969 Blue Bird initiated a policy of selling some of its stock to executive employees and officers other than members of the Luce family. In March 1969 it sold 10 shares to Corbin J. Davis, an officer. Preliminary to such sale it amended its by-laws to provide that no stockholder or his heirs, personal representatives or assigns may sell, pledge or otherwise dispose of any shares until he first offers to sell them to the corporation at their book value as of the end of the next preceding fiscal year. If the corporation fails to repurchase the shares within 45 days, he is to offer them to the other stockholders pro rata at the same price. If any of the other stockholders fails to exercise his purchase rights, he is to assign them to the remaining stockholders. Only if the other stockholders fail to make the purchase, may the stock be sold to outsiders.

Thereafter, from 1969 through the corporation's fiscal year ending October 30, 1976, sixteen managerial and executive employees acquired a total of 33,429 shares of Blue Bird at book values as of the end of the fiscal years preceding their acquisitions. Some shares were sold to such employees for cash; others were issued as additional compensation. Blue Bird has bought back shares from the estate of one such employee and from two others who left its employment—always at book value as of the end of the preceding fiscal year.

In 1972 the three plaintiffs gave 139,320 shares of Blue Bird stock to eight trusts for their children and grandchildren, naming themselves as co-trustees with the Citizens and Southern National Bank of the trusts of which they were grantors.

Following the 1976 gifts, Blue Bird's stock was owned:

| Owner | Shares | Percentage |
|---|---|---|
| Plaintiffs | 312,251 | 53.6 |
| Plaintiffs' children | 14,000 | 2.4 |
| Citizens and Southern National Bank as trustee or as co-trustee with plaintiffs | 222,320 | 38.2 |
| Non-family executives | 33,429 | 5.8 |
| | 582,000 | 100.0 |

Section 2512(a) of the Internal Revenue Code of 1954 provides that for gift tax purposes, "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." Treasury Regulations on Gift Tax (1954 Code) § 25.2512–1, (26 C.F.R.)), states that such value is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts."

One of the more difficult property valuation problems is the appropriate method and measure of valuation of the shares of the stock of a closely held corporation, which are not ordinarily traded on an open market. *See Righter v. United States*, 194 Ct.Cl. 400, 407, 439 F.2d 1204, 1207 (1971). Section 2031 of the Code, relating to the estate tax, provides:

(b) Valuation of unlisted stock and securities.—In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.

While no similar provision appears in the gift tax sections of the Code, gift tax Regulations § 25.2512–2(f)—provides that where selling prices or bid and asked prices are

1. Although the wives are necessary parties to the suit by virtue of their election to treat the gifts as made by both husbands and wives, the term plaintiffs will be used hereinafter to refer exclusively to the husbands because they paid the taxes.

unavailable, the valuation of shares of stock is to be determined by taking into consideration the company's net worth, prospective earning power, dividend-paying capacity, goodwill, economic outlook in the industry, the company's position in the industry, its management, the degree of control of the business represented by the block of stock, the value of securities of corporations engaged in similar lines of business which are listed in a stock exchange, and other relevant factors. *See also Penn Yan Agway Cooperative, Inc. v. United States,* 189 Ct.Cl. 434, 446, 417 F.2d 1372, 1378 (1969); *Arc Realty Co. v. Commissioner,* 295 F.2d 98, 103 (8th Cir.1961).

In 1976 Blue Bird was primarily a manufacturer and seller of school bus type vehicles, plus a limited number of small urban transit buses and luxury motor homes. As previously noted, the enterprise had been founded in 1927 by Mr. A.L. Luce, Sr. After their return from military service in World War II, his three sons, the plaintiffs, entered the business with him and have been in control of the business since their father's death in 1962. The business has grown steadily. In 1945 Blue Bird manufactured 750 bus bodies, in 1946, 1,000. By 1976 Blue Bird was producing 10,000 buses per year.

Approximately 56 percent of Blue Bird's 1976 sales revenue were derived from the sale of buses for which the chassis and engines were provided by the truck manufacturers, such as Ford, GM or International Harvester. The manufacturers inventoried their trucks on Blue Bird property, and Blue Bird's only obligation was to maintain insurance on them. Blue Bird built the bodies, including seats, electrical wiring and all other appurtenances, installed chassis and engines and shipped the finished buses to the customers. An additional 30 percent of Blue Bird's revenues came from the sale of buses for which Blue Bird manufactured the chassis as well as the bodies, installing, however, engines manufactured by such engine manufacturers as Ford, GM, Cummins or Caterpillar. The remaining 14 percent of sales volume was about evenly divided between urban transit buses and the motor homes.

Blue Bird's domestic sales are generated primarily through corporate or distributor competitive bidding for state, county, and local government sales. Approximately 20 to 30 percent of Blue Bird's revenues result from state purchases by competitive bid. The other source of domestic sales for Blue Bird comes from its distributor network. In 1976, this network was comprised of 54 distributors and five direct factory representatives. A distributor may sell on the basis of competitive bids or through negotiations with school boards or with contractors to school boards at the county level. In 1975 and 1976, Blue Bird was also very active in the export market, and, during that time, the export market was very strong. Large orders from Middle Eastern countries contributed to the 1975-76 growth in export sales.

Many of Blue Bird's distributors have been with the Company from 20 to 30 years. Many distribute solely Blue Bird products; however, some sell, in addition, trucks, autos, or other school equipment.

Although the school bus industry is highly competitive and school bus manufacturers generally have had the capacity to produce twice as many buses as the market demand, in 1976 Blue Bird was one of the top two or three companies in unit sales in the industry. It supplied 22.4 percent of the school buses sold in the United States, 45 percent of the school buses sold in Canada and approximately 25 percent of the school buses used for such purpose in all the other countries. It was a half-century old well-established company with a good, solid, basic market. Its facilities and machinery and equipment were in good condition and well maintained. Its principal executives had been with the company for substantial periods of time, its employees were well paid, and its labor relations were good. It had no significant long term debt and it had a good line of credit. It had a network of franchises and qualified salesmen selling its products in the United States, Canada, and in the international markets. Its sales, production, and profits were on the rise, and its competitors had a difficult time competing with it. It had generally and consistently been a successful and profitable business; and its management had plans and expectations for boosting its profits by increasing its unit sales to 25 percent of the domestic market by 1980, which would give it the number

one spot. In fact, it achieved this goal by 1978 or 1979.

Plaintiff produced, as an expert witness to testify with respect to the fair market value of the gifts of stock at issue, Mr. Charles B. Shelton, III, First Vice President in the corporate finance department of The Robinson-Humphrey Company, Inc., a member of the New York, American and Midwest Stock Exchanges and a full-service investment banking and brokerage house.

He determined that, based on information provided by management and a review of market conditions in the fall of 1976, the difference in the values of Blue Bird's common stock on September 30 and October 29, 1976, when the two sets of gifts were made, was negligible, and accordingly valued them both as of the latter date.

He accepted as correct and without further investigation the financial information concerning the company provided by Blue Bird's management. Included were audited financial statements of Blue Bird for the fiscal years ended in October 1971 through 1975, but not for 1976. Because the financial statement for October 30, 1976, was not yet available on October 29, 1976, he substituted the company's earnings projection for the fiscal year ending October 30, 1976, made by the company in the summer of 1976. And he added a forecast for fiscal 1977, also made in the summer of 1976. He summarized the earnings record for 1971–75 as follows:

| (000's omitted) | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|
| Net Sales | $32,008 | $36,888 | $40,649 | $55,123 | $78,886 |
| Earnings | 2,125 | 2,520 | 2,507 | 2,071 | 6,381 |
| Earnings Per Share | 3.75 | 4.45 | 4.38 | 3.56 | 10.98 |
| Net Profit Margin | 7% | 7% | 6% | 4% | 8% |

He set forth the 1976 and 1977 estimates comparatively with the actual results for 1974 and 1975 as follows:

| | 1974 | 1975 | 1976 Est. | 1977 Est. |
|---|---|---|---|---|
| Units Sold | 7,701 | 9,566 | 8,995 | 10,221 |
| % Increase (Decrease) in Units Sold | | 24.2% | (6.0)% | 13.6% |
| Earnings (000's omitted) | $2,071 | $6,381 | $5,932 | $3,670 |
| % Increase (Decrease) in Earnings | | 208% | (7.0)% | (38.1)% |

He also noted that the company's net worth as of November 1, 1975, was $22,839,000 (or $39.24 per share), and, after subtracting goodwill, that tangible net worth was $22,503,000 (or $38.73 per share).

In order to determine the value of the 97,000 shares which were the subject of the gift, he first found it necessary to value 100 percent of the equity in the company, which was represented by 582,000 shares of stock.

Mr. Shelton's report and testimony discussed various measure of value for the stock of the entire company but he ultimately relied on only one.

He rejected the market comparison approach, which arrives at the value of a closely held company by applying to it the ratios which the market price of the stock of a publicly owned company in the same industry bears to its earnings, dividends and net book value, on the ground that he was unaware of any publicly traded company whose business was similar to that of Blue Bird in product, size and scope.

He rejected an asset appraisal approach to value on the ground that Blue Bird was a going concern and its management had no intention of liquidating the assets.

He found the book value of Blue Bird's net assets, or net worth, was $22,838,818 or $39.24 per share on November 1, 1975, and an estimated $28,189,000, or $48.43 per share on October 29, 1976 (after giving effect to a $1.00 per share dividend declared October 25, 1976), but rejected that too.

The only method he discussed to arrive at value on the basis of objective comparative data with respect to other companies was

the capitalized excess earnings method of valuation. Under this method the average return of a company on its tangible net worth (the book value of tangible assets less liabilities) over a number of years is compared to that of its industry. To the extent that the company's average return on its tangible net worth is at a rate in excess of that prevailing in the industry generally, it is assumed that such excess earnings indicate it has intangible value (or goodwill) in excess of the value of its tangible net worth. To ascertain what that value is, that portion of the earnings is capitalized at a suitable rate commensurate with the investment risk. The product is then added to the value of the tangibles to determine total value.

In making this comparison, Mr. Shelton used the average net book value of Blue Bird's tangible assets for the years 1972–76 and the average earnings for the same years. For the industry comparisons for return on net worth, he used Annual Statement Studies for 1977, by Robert Morris Associates, covering eleven companies of similar asset size as Blue Bird, primarily engaged in manufacturing automobile bodies, or assembling complete passenger cars, trucks, commercial cars, buses and special purpose vehicles, with fiscal years ending in 1976; Standard & Poor's Automobile Index; Standard & Poor's Automobile Index excluding General Motors; Standard & Poor's Automobiles-Trucks & Parts Index and Standard & Poor's 400 Industrial Index. The comparison was as follows:

BLUE BIRD BODY COMPANY
COMPARISON OF RETURNS ON
NET WORTH RATIOS
(Using Tangible Net Worth, Net of Goodwill)

| Blue Bird Body Company Return on Net Worth | |
|---|---|
| 1976 | 20.9% Est. |
| 1975 | 28.4% |
| 1974 | 12.2% |
| 1973 | 16.1% |
| 1972 | 18.4% |
| Average 1972–1976 | 19.2% |

| Robert Morris Associates Industry Median Return On Net Worth | |
|---|---|
| 1976 | 15.40% |
| 1975 | 9.13% |
| 1974 | 7.98% |
| 1973 | 11.72% |
| 1972 | N.A. |
| Average 1973–1976 | 11.06% |

| Standard & Poor's Automobile Index | |
|---|---|
| 1976 | 17.33% |
| 1975 | 5.74% |
| 1974 | 6.05% |
| 1973 | 16.94% |
| 1972 | 16.61% |
| Average 1972–1976 | 12.53% |

| Standard & Poor's Automobile Index Excluding GM | |
|---|---|
| 1976 | 12.78% |
| 1975 | Def. |
| 1974 | 3.82% |
| 1973 | 12.89% |
| 1972 | 12.86% |
| Average 1972–1976 | 8.47% |

| Standard & Poor's Automobiles-Trucks & Parts Index | |
|---|---|
| 1976 | 14.28% |
| 1975 | Def. |
| 1974 | 8.60% |
| 1973 | 11.07% |
| 1972 | 6.57% |
| Average 1972–1976 | 8.10% |

| Standard & Poor's 400 Industrial Index | |
|---|---|
| 1976 | 14.02% |
| 1975 | 12.11% |
| 1974 | 14.17% |
| 1973 | 14.15% |
| 1972 | 11.71% |
| Average 1972–1976 | 13.23% |

Although over the preceding 5 years Blue Bird had earned a rate of return on tangible net worth substantially in excess of that earned by each group of comparables, nevertheless he applied a relatively low multiple, five times earnings, to the excess yield. Despite the low multiple, however, this method resulted in a total value of $32,373,000 for the whole company, equivalent to $55.62 per share.

All of the foregoing, however, appears to have been mere padding. Mr. Shelton disregarded the $39.24 and $48.43 book values, for the stated reason that the shares of some publicly held companies in the automotive industry in some years sold at prices below their book values and because he was of the opinion that earnings are generally the most important factor bearing on the value of a going concern. Also, after having gone to the trouble of making all of the

foregoing calculations and comparisons, Shelton then repudiated the $55.62 value he determined by the capitalized excess earnings method of valuation because the industries whose rates of return were used were broader than Blue Bird and not largely confined to school buses, because Blue Bird's average rate of return was inflated by its 1975 high earnings level, and because the method did not consider all relevant factors.

Mr. Shelton arrived at his valuation of the company by a modified capitalization of earnings method. He averaged Blue Bird's reported earnings for 1972–75 together with the estimate for 1976 and the projection for 1977, and obtained an average earnings base of $3,847,000. Dividing this earnings base by the 20 percent capitalization rate (or applying a multiple of five times earnings) resulted in a total value for the company under this approach of $19,235,000. He then added to that figure a sum sufficient to increase the $19,235,000 to $21,500,000, without explanation other than that it was a matter of judgment. Dividing this figure by the 582,000 outstanding shares arrives at a per share value of $37 for the whole company.

Shelton then reduced the $37 per share by 30 percent to $26, for the 97,000 shares which were the subject of the gifts, because they represented in the aggregate only a 17 percent minority interest, which lacked an established market for sale to the public, and absent such a sale they were subject to the will of the controlling stockholders, who could use the corporation to benefit themselves at the expense of other stockholders.

■ Mr. Shelton's method of valuation is subject to criticism in several respects. First, the earnings he used are not necessarily representative of the earning capacity of the business. As the court stated in *Central Trust Co. v. United States*, 158 Ct.Cl. 504, 530, 305 F.2d 393, 409 (1962), in using reported earnings as a basis for stock valuation, it is "proper to make such adjustments therein as would be necessary to eliminate abnormal and nonrecurring

items and to redistribute items of expense to their proper periods."

Blue Bird's 1974 earnings had been reduced by approximately $787,000 as a result of a one time change in the company's method of accounting. By converting from first-in first-out to last-in first-out inventory accounting in that year, Blue Bird decreased its closing inventory and pre-tax income by $1,430,800. Restoration of this sum less the offsetting tax savings attributable thereto (at the 45 percent rate used by Shelton) results in additional representative after-tax earnings of $787,000 for the year. Applying this increase to Shelton's capitalized average earnings computation results in a $1.13 per share increase in his valuation of the company.

The 1976 earnings estimate used in Mr. Shelton's earning's base, $5,932,000, was short of the earnings reported for that year, $6,381,000, by $449,000. The estimate relied on was made during the summer of 1976. However, monthly financial statements were available, and Mr. Pennington, Blue Bird's independent auditor, testified that by the end of September 1976 they would have enabled determination of the annual income with 80–90 percent accuracy. Plaintiffs have not shown that as the valuation date at issue, October 29, 1976, only one day prior to the close of the fiscal year, Blue Bird's auditors could not have furnished Mr. Shelton a closer approximation of actual earnings for the year than that made during the summer. Adjustment of the earnings base for this increase results in an additional increase of $0.64 per share in Mr. Shelton's valuation for the whole company.

The reported earnings were after reduction each year by approximately 10 percent for contributions to a private charitable trust (The Rainbow Fund) of which the three Luce brothers were the trustees. In 1976 the contribution was $575,000. It is difficult to understand why the earnings base for valuation of a company should be reduced by such a voluntary diversion of earnings which was not shown to benefit the corporation. Mr. Shelton argued that since the siphoning off of earnings by con-

trolling stockholders was adverse to a minority interest, an adjustment for this annual sum should not increase the value of the gift shares. However, it is a proper item for adjustment of the earnings base in determining the value of the entire corporation prior to computing the value of a minority interest; otherwise the witness' discount for a minority interest is duplicated. More important, once there is a significant unrelated minority interest, a serious question arises as to the right of the controlling stockholders to continue to divert a substantial share of the corporate earnings to their private charitable foundation without the consent of all of the stockholders. *See A.P. Smith Manufacturing Co. v. Barlow*, 13 N.J. 145, 98 A.2d 581 (1953); Annot. 39 A.L.R.2d 1192 (1955); 19 Am.Jur., Corporations § 1015; and H. Ballantine on Corporations (Rev.Ed.) § 85 at 228.

Mr. Shelton included in his earnings base a forecast of earnings for 1977, which had been prepared by the company in the summer of 1976. Although the forecast was for $3,670,100 in earnings and the actual 1977 earnings turned out to be $3,883,600, the propinquity of the forecast to the actual results (6 percent below) does not necessarily show the soundness of the forecast. It actually appears to be happenstance. The forecast was made in the summer of 1976, up to 5 months before the beginning of the 1977 fiscal year. The projection was for substantially increased sales, both in units and dollars, over prior years. The forecast of reduced earnings was based on projections of increased inflation rates and correspondingly higher material and labor costs generally, and was thought by Albert Luce to be a single year's break in the trend of increased earnings. The June 1980 report of a company official responsible for the forecast explains that the 1977 results were close to the forecast because "cost increases were not quite as great as anticipated", but "On the other hand price increases were not as great as anticipated."

The use of an earnings forecast made months prior to the start of the year, and which is based on predictions of the general inflation rate with respect to raw material

and labor costs generally, as a base for capitalization of earnings is subject to great error. The unreliability of such an initial estimate may be inferred from the fact that the corresponding initial forecast for 1976 was for $2,985,800 in earnings, while actual earnings turned out to be $6,189,000, more than 100 percent higher. The risks associated with such forecasts of future earnings are more properly a function of the capitalization rate than the earnings base. To reflect a forecast of a possible earnings decrease for a single future year in both the base and the rate results in an exaggeration of the effect of such a forecast.

On November 5, 1981, Mr. Shelton prepared another valuation report for the plaintiff on the entire Blue Bird stock as of August 10, 1981, for purposes of a proposed recapitalization of the company. This did not involve a tax problem. In it he followed the same general method of valuation. However, for the average earnings base he used the results of the 1976 through 1980 years and the estimate for 1981. The latter he derived from the results for the 7 months ending in May 1981. He did not include any forecast for 1982.

In addition, in constructing the earnings base in the 1981 valuation report, Mr. Shelton used a method of averaging which emphasizes the importance of the most recent experience. He used the sum of the digits method, which places greatest weight on the most recent years, to arrive at average earnings for 1976 to 1980, and then weighed that at 40 percent and the estimated whole year 1981 earnings at 60 percent to arrive at the average for 1976–81. Had he applied that method to his 1972–76 earnings the earnings base would have been much higher, to wit:

| Year | Earnings | Weight Factor | Weighted Earnings |
|---|---|---|---|
| 1972 | 2,519,845 | x 1/10 | 251,984 |
| 1973 | 2,507,003 | x 2/10 | 501,401 |
| 1974 | 2,071,386 | x 3/10 | 621,416 |
| 1975 | 6,381,385 | x 4/10 | 2,552,554 |
| | | 10/10 | 3,927,355 |
| | x weight factor of | | 40% |
| | | | 1,570,942 |
| 1976 | 5,931,800 x weight factor of 60% = | | 3,559,140 |
| Weighted Earnings Base | | | $ 5,130,082 |

This compares to the average earnings base of $3,847,000 he actually used to value the entire company as of October 29, 1976.

In *Central Trust Co. v. United States,* 158 Ct.Cl. at 522, 305 F.2d at 404, the court pointed out that mere averages may be deceiving since they equate both increasing and decreasing earnings without regard to their trend, and that "the most recent years' earnings are to be accorded the greatest weight."

For the foregoing reasons, Mr. Shelton's average earnings were not a wholly reliable base for the capitalization of earnings method of valuation.

Second, Mr. Shelton's valuation of Blue Bird at $37 per share as of October 29, 1976, is unacceptable because it is almost a fourth less than the book value of its net assets less liabilities, $48.98, as of October 30, 1976, even though all but one percent of that book value was represented by tangible assets, cash and receivables. Indeed, an appraisal of the tangible assets at Blue Bird's main plants, made for insurance purposes as of December 12, 1975, established that the replacement cost of such assets less sustained depreciation was far in excess of their book value and that had it been substituted for the book figures the book value per share would have been increased to $61.65.

██ If a company's net worth consists of substantial write-ups of intangible value acquired in mergers or corporate acquisitions, if it has paid inflated prices for its assets, or if its machinery and equipment are obsolete, and it has consistently been unable to obtain a fair return on its investment, then the fair market value of the company may understandably be less than its book value. But the undisputed evidence here is that as of the valuation date Blue Bird's ownership had been in the same family since it was organized, its net worth was not inflated by any substantial intangible value, and its plant and equipment were in good condition and enabled it

to be a dominant company in its industry. Moreover, Mr. Shelton's own computations showed that the company's returns on its tangible net worth ranged between 16.1 and 28.4 percent, with an average of 19.2 percent, over the preceding 5 years, returns far in excess of those earned in the closest comparable industries Mr. Shelton could find. A seller could hardly have been expected to be willing to accept 25 percent less for the company than the cost of duplicating the net depreciated tangible assets alone, without regard to its value as a going concern with goodwill, qualified personnel, an established national distributors' organization and high earning capacity; and a hypothetical buyer could also hardly have expected that he could obtain it for that price.[2] In such circumstances, it is reasonable to conclude that book value is at the least a floor under fair market value, which an appraiser may not properly ignore. *Cf. Schwartz v. C.I.R.,* 560 F.2d 311, 316–17 (8th Cir.1977); *Hamm v. C.I.R.,* 325 F.2d 934, 937, 941 (8th Cir.1963), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *City Bank Farmers Trust Co. v. Commissioner,* 23 B.T.A. 663, 669 (1931).

Third, the most serious weakness in Mr. Shelton's valuation of the company lies is in his failure to supply a rational objective basis for the key element thereof, the capitalization rate he applied to Blue Bird's average earnings. He testified that in his judgment "a buyer of such securities of the risks inherent in Blue Bird would look for a 20 percent return." However, he was unable to furnish any objective data with respect to any comparable situations underlying that judgment, so as to enable the court to determine whether it was soundly based. Nor could he supply any objective data which would tend to support a judgment that a knowledgeable seller would be willing to dispose of the Blue Bird stock at a price so low as to be no more than he would have received in just 5 years of its average earnings or 3 years of its most recent earn-

---

**2.** This is also supported by the fact that the controlling stockholders contemporaneously of stock and gave bonuses to exec-

utive employees at book value as of the end of the prior year and deemed the price to be at least fair to the employees.

ings. When pressed, Mr. Shelton fell back on his "experience"; but he conceded he was not an expert on the market for school buses and had never sold stock of any company which manufactured or sold buses, and could not identify a single contemporaneous purchase or sale of the stock of any company in his experience which was the basis of his judgment. Nor, even omitting the names of the participants, could he describe the circumstances of any comparative purchase or sale. Assuming (without necessarily deciding) the good faith of Mr. Shelton's testimony, it must be concluded that his judgment in this regard was merely intuitive and the basis therefor was not susceptible of rational or objective examination or evaluation by the court.[3]

Nor is Mr. Shelton's judgment that $2,265,000 should be added to the capitalized earnings base any more rationally founded. It is self-evident that it was added to raise the $19,235,000 to $21,500,000 in order to reach a predetermined round figure. It may also be inferred that it is in recognition that the other methods of valuation reached considerably higher figures. But why $21,500,000 rather than some other figure? It must be concluded that the witness' judgment in this regard is equally intuitive and not based on objective facts or reasoning susceptible of objective examination or evaluation.

■ Plaintiffs argue in their brief that "The value of expert opinion testimony lies in the qualifications of the witness" and that it is not the court's role to reason why. But however difficult, the law has never deemed the valuation of the stock of a closely held company to be an arcane or occult craft beyond the ken of courts, which must be content to evaluate only the credibility of the expert witness. "[L]ike any other judgments, those of an expert

can be no better than the soundness of the reasons that stand in support of them." (*Fehrs v. United States*, 223 Ct.Cl. 488, 508, 620 F.2d 255, 265 (1980).) The opinion of an expert witness is "no better than the convincing nature of the reasons offered in support of his testimony" (*Potts, Davis & Company v. C.I.R.*, 431 F.2d 1222, 1226 (9th Cir.1970).) "Opinion evidence, to be of any value, should be based either upon admitted facts or upon facts, within the knowledge of the witness, disclosed in the record. Opinion evidence that does not appear to be based upon disclosed facts is of little or no value." (*Balaban & Katz Corp. v. Commissioner*, 30 F.2d 807, 808 (7th Cir.1929)).[4] "[I]n order for the opinion to have any value it must be based on assumptions which the trier of facts can find to have been proved", (*Rewis v. United States*, 369 F.2d 595, 602 (5th Cir.1966).) A court "is not required to surrender its judgment to the judgment of experts." (*Hamm v. Commissioner*, 325 F.2d 934, 941 (8th Cir.1963).) *And see also The Conqueror*, 166 U.S. 110, 131–33, 17 S.Ct. 510, 518, 41 L.Ed. 937 (1897); *Pumice Supply Co. v. C.I.R.*, 308 F.2d 766, 769 (9th Cir.1962); and *Gloyd v. Commissioner*, 63 F.2d 649, 650 (8th Cir.), *cert. denied*, 290 U.S. 633, 54 S.Ct. 52, 78 L.Ed. 551 (1933).

■ Finally, plaintiff's reliance upon Shelton's determination that the fair market value of the 97,000 shares which were the subject of the gifts should be reduced by 30 percent, to $26 per share, because as a minority interest without an established market they could not be sold to the public except at a substantial discount, is based on a misconception of both the law and the facts. First, under the law, the applicable market in which the hypothetical willing buyer may be found need not be one which includes the general public. It is sufficient

**3.** In support of the 20 percent capitalization rate, plaintiff argues that the government's expert witness used a 5.3 multiple of earnings which is not very far from Shelton's. The fact is, however, that the government's witness used a multiple of 7.7 times the 5 year average for 1972–76 and 5.3 times 1976 earnings, to arrive at a value of $54 per share. As noted

hereinafter, the court finds it unnecessary to rely on the government's expert testimony.

**4.** Also quoted with approval in *Continental Water Co. v. United States*, 49 A.F.T.R.2d 82–1070, 1080 (1982), (Trial Judge, Court of Claims), adopted *per curiam* 231 Ct.Cl. ——, 50 A.F.T.R. 82–5128 (1982).

if there are potential buyers among those closely connected with the corporation.

In *Rothgery v. United States,* 201 Ct.Cl. 183, 189, 475 F.2d 591, 594 (1973), there was at issue the valuation for estate tax purposes of 50 percent of the stock of an automobile dealership, the remaining 50 percent being owned by the decedent's son. Since there was no public market for the shares, the court found the value of the entire stock from the book value and appraisals of the underlying assets less the liabilities, and then allocated that value on a per share basis. The court responded to the estate's argument that the pro rata allocation was excessive because there was no public market for the decedent's shares and because the 50 percent interest of the estate was not a controlling interest, by finding that the decedent's son would have been a willing buyer of the shares from any hypothetical seller; that the son intended to continue the corporate business after his father's death; that he wished to have control of the corporation, so that his own son might have a place in the business; that this objective required the acquisition of the decedent's stock interest in the corporation; and that the evidence warranted the inference that the son would have been willing to pay—and from a business standpoint would have been justified in paying—for the decedent's half-interest in the corporation an amount equal to half the value of the corporation's assets. This was a market sufficient to negate any need for a discount to sell the shares.

In *Couzens v. Commissioner,* 11 B.T.A. 1040 (1928), the Board of Tax Appeals was required to find the value of the Ford Motor Company stock on March 1, 1913, in order to determine the late Senator Couzen's gain on the sale of his stock in 1920. Prior to the 1920 sale only ten individuals were the sole stockholders, there was no public market for the stock, and there was a restriction on the certificates giving existing shareholders the prior right to purchase the stock at the price at which it was offered to an outsider. The Commissioner argued that the limited market for the shares under such circumstances depressed the value of a minority interest below the fair market value of the shares as a whole and would have necessitated a substantial discount to make them saleable to a willing buyer. In rejecting this contention, the court stated (11 B.T.A. at 1164):

> We do not construe a fair market as meaning that the whole world must be a potential buyer, but only that there are sufficient available persons able to buy to assure a fair and reasonable price in the light of the circumstances affecting value.[5]

On cross-examination, Mr. Shelton likewise concurred that if the company or its controlling stockholders pursued a policy of buying back shares from persons who were not family members or executive employees, that fact could put a greater value on the shares by providing a potential market for them.

The record in this case establishes that there was indeed an available market for the shares at issue within the company or among persons associated with the company. Plaintiff Albert L. Luce testified[6] that it was company and Luce policy that all shares of Blue Bird's stock remain in the ownership of members of the Luce family, of trusts for their benefit, and of executive employee. This purpose motivated the adoption of the by-law in 1969, when shares were first offered to executive employee Corbin Davis, requiring any stockholder desiring to dispose of his shares to offer them first to the corporation and then to the remaining stockholders at book value.

---

**5.** *Accord: Estate of Goldstein v. Commissioner,* 33 T.C. 1032, 1037 (1960), *affirmed on another issue,* 340 F.2d 24 (2nd Cir.1965); *Smith v. Commissioner,* 46 B.T.A. 340–41 (1942), *mod., sub nom., Worcester County Trust Co. v. Commissioner,* 134 F.2d 578 (1st Cir.1943).

**6.** Neither of the other plaintiffs testified. Joseph Luce was hospitalized at the time of trial, but no explanation was given for George's absence, nor was any effort made to obtain Joseph's testimony at another time. It is assumed therefore that there was no divergence as to the facts and Albert spoke for all three.

Thereafter, whenever shares were offered to an employee, Albert Luce personally told him that the company would repurchase the shares at book value if he left the company, died or desired to dispose of the shares for any other reason; and the company has in fact followed this practice.

The company's purpose for the by-law and commitment was explained by Albert as follows:

> As we offered the stock to other members, other than the Luce family, and to some of our top executives, we did not want them to dispose of their stock to our competitors or someone we would not want to know more details about our operation or our business.

He elaborated on this theme that they wanted control of the company to remain in the family and that it was their intent that no shares be held by strangers generally. Accordingly, no shares have ever been sold to outsiders.

The same intent prevailed with respect to the shares given to the trustee for the benefit of other members of their family. Luce testified that had the trustee desired to sell any of the shares on the open market he would not have allowed it, but would have bought it back, because, as a major stockholder, he wanted to retain control of the block of stock, he wanted it to remain in the family, and he had no intention of allowing it to go to outsiders. Furthermore, he conceded he would even have paid "a premium over whatever the fair market value might be not to let any Blue Bird shares get outside the Luce family and the executives or corporate management."

Even without regard to the personal funds of the Luce brothers and their families, it is clear that as of October 29, 1976, Blue Bird had the financial resources to pay for the 97,000 shares at the $39.31 1975 book value at which they were reported on the gift tax returns if they were offered to it by the trustee or by a willing buyer from the trustee. The cost of such a purchase would have been $3,813,070. The company's financial report as of October 30, 1976, shows it had net current assets (less current liabilities) of $13,375,405, of which cash and receivables were $4,697,151, and, in addition, it owned $3,480,597 in cash value of life insurance on the lives of its officers, against which it could borrow at will. It also had a good line of credit and substantial borrowing capacity, its long term liabilities being no more than $1.7 million, which was less than 6 percent of equity.

In addition to the corporation itself and its controlling stockholders there was a further market for the shares among the other managerial employees of Blue Bird. Corbin Davis, the company's vice-president for marketing, testified without contradiction that since 1976 fifteen to twenty other managerial employees who were offered stock in the corporation at book value took the opportunity to purchase it and that there were 200 other employees in the management team, every one of whom would have been eager to purchase shares at the same price if it had been offered to him.

Thus, there was no occasion for a 30 percent discount in order for the hypothetical seller to find a willing buyer.

▪ In a suit for refund of federal income taxes, the taxpayer bears the burden of proving that he has overpaid his taxes. This means that not only must he establish that the assessment was erroneous, but also the amount which is correct. *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976), *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *E.I. DuPont De Nemours & Co. v. United States,* 221 Ct.Cl. 333, 349–50, 608 F.2d 445, 454 (1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980); *Dysart v. United States,* 169 Ct.Cl. 276, 340 F.2d 624 (1965). Since plaintiffs paid gift taxes on their gifts of 97,000 shares on the basis of a $39.31 per share value, plaintiffs are only entitled to a refund if they can demonstrate the extent to which such value was excessive. Plaintiffs have failed to prove by their evidence that any portion of the $39.31 per share was

excessive.[7] Accordingly, it is unnecessary to review the testimony of defendant's valuation witnesses and defendant's other arguments, such as the argument that the prices the employees paid for their stock and the deductions the corporation took on its tax return for the stock bonuses are actual transactions more persuasive than opinions on hypothetical facts.

Wherefore, the clerk is directed to enter judgment for the defendant and to dismiss the complaint.

---

7. Indeed, to the contrary, a fair inference may be drawn that on October 29, 1976, no hypothetical informed seller with knowledge of the results shown in the monthly audit reports would have been willing to sell his shares at the $39.31 book value as of the end of the prior year, when, by waiting only one or two addi-. tional days, in all probability he could have commanded a $48.98 price, the book value as of October 30, 1976.