ESTATE OF ELIZABETH B. MURPHY, DECEASED, FIRST BANK (NATIONAL ASSOCIATION)-DULUTH AND RICHARD R. BURNS, AS CO-PERSONAL REPRESENTATIVES AND CO-TRUSTEES UNDER AGREEMENT WITH ELIZABETH B. MURPHY, DATED FEBRUARY 3, 1981, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Murphy v. Commissioner
Docket Nos. 32730-86, 32731-86
United States Tax Court
T.C. Memo 1990-472; 1990 Tax Ct. Memo LEXIS 520; 60 T.C.M. (CCH) 645; T.C.M. (RIA) 90472; August 30, 1990, Filed *520 Decisions will be entered under Rule 155. Beginning after her husband's death in 1971, until 1982, D had a general power of appointment with respect to a controlling interest in a family-run, closely held corporation which owned publishing and broadcast subsidiaries. Several experts for both parties testified regarding the value of the stock. D was president of the corporation until 1980. She was chairman of the board from 1980 until her death. Her son became president in 1980. Her daughter became vice president in 1980 and president of the broadcast subsidiaries in 1981. Eighteen days before her death, D transferred .88 percent of the stock to each of her two children. D made a testamentary gift in trust for their benefit of the remaining 49.65 percent. The sole purpose of the pre-death transfer of .88 percent to each child was to obtain a minority discount for the stock. The transfers did not appreciably affect D's beneficial interest except to avoid Federal transfer taxes on the control premium. Held, value of stock decided. Held further, a discount is allowed for lack of marketability, and because Wisconsin State law limits sales of substantially *521 all of the assets of the corporation. Held further, a minority discount is not allowed. Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (en banc), distinguished. Raymond L. Erickson and Richard R. Burns, for the petitioner. Jack Forsberg, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in decedent's Federal estate tax of $ 8,133,984 and a deficiency in gift tax for the calendar year 1982 of $ 10,248,403. Both deficiency notices result from a dispute concerning the valuation of a 51.41 percent block of stock over which the decedent had a general power of appointment during her life. The gift tax deficiency notice results from the decedent's gift of .88 percent of that stock to each of her two children shortly before her death. The estate tax deficiency results from the decedent's *525 testamentary bequest of her remaining 49.65 percent to trusts established for her two children. These cases were consolidated for trial, briefing, and opinion. After concessions the primary issues for decision are: (1) Determination of the fair market value of stock in a closely held corporation. Before consideration of discounts, we hold that the per-share value of the stock was $ 825. (2) Whether to allow discounts for lack of marketability and because Wisconsin State law limits sales of substantially all of the assets of the corporation. We hold that a 20-percent discount for these factors is appropriate, reducing the per-share value to $ 660. (3) Whether to allow a minority discount. We hold that petitioner is not entitled to a minority discount. The decedent was president of the corporation until 1980. She was chairman of the board from 1980 until her death. Her son became president in 1980. Her daughter became vice president in 1980 and president of the broadcast subsidiaries in 1981. During her life, the decedent had a general power of appointment over shares representing a controlling interest in the corporation. For the sake of convenience, and because a *526 general power of appointment is the functional equivalent of ownership, the decedent will sometimes be treated as owning the block of stock at issue here. Before her death, her tax adviser advised her to transfer a small amount of stock to her children. As a result, the decedent transferred .88 percent of the stock to each of her children (leaving her with 49.65 percent) 18 days before her death. The decedent made a testamentary gift of the remaining 49.65 percent of the stock in trust to them. The sole purpose of bifurcating the transfer of control to her children was to obtain a minority discount for the stock. Transfer of the gift fragments did not appreciably affect the decedent's beneficial interest except to avoid Federal transfer taxes on the control premium. Petitioner relies on Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (en banc) and its progeny. We conclude that such reliance is misplaced. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect as of the date of the decedent's gift and decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. *527 In Estate of Murphy v. Commissioner, T.C. Memo. 1990-346, we denied petitioner's motion to seal various documents which were admitted into evidence at trial. In that opinion we indicated that those documents requested to be sealed would remain under seal to preserve petitioner's rights pending appeal. In this opinion, to the extent possible, we have minimized specific findings concerning the Evening Telegram Company's financial condition. We have, nevertheless, considered the entire record, and our general findings are consistent therewith. E.g., Estate of Hall v. Commissioner, 92 T.C. 312, 322 n.1 (1989); Estate of Gallo v. Commissioner, T.C. Memo. 1985-363 at n.1, 54 P-H Memo T.C. par. 85,363 at 1594, 50 T.C.M. 470, 474 n.1. However, some facts about the businesses, and portions of decedent's tax planning memoranda, which petitioner sought to have sealed have been made a part of this opinion because they form the basis for the Court's decision, and because they are required to be included for proper evaluation of the decision. *528 Joy v. North, 692 F.2d 880, 893-894, 897 (2d Cir. 1982); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F. Supp. 866, 901 (E.D. Pa. 1981). See Public Service Commission v. Wisconsin Telephone Co., 289 U.S. 67, 69 (1933); Virginia Railway v. United States, 272 U.S. 658, 675 (1926). I. GENERAL FINDINGS OF FACT Some the facts have been stipulated and are so found. Those facts and exhibits are incorporated in our findings by this reference. A. GENERAL
1. The Estate and the Transfer Tax Returns
Elizabeth B. Murphy (decedent) died testate on August 16, 1982. Under the will, First Bank-Duluth and Richard R. Burns were the personal representatives of decedent's estate. First Bank-North is now the successor in interest to First Bank-Duluth and Northern City National Bank of Duluth. At the time these petitions were filed, Richard R. Burns resided i Duluth, Minnesota, and First Bank-North was a corporation with its principal place of business at Duluth, Minnesota. Decedent's Federal estate and 1982 gift tax returns were prepared by Mr. Warren Randy and timely filed in Duluth, Minnesota. *529 The 5,610 voting shares of Evening Telegram Company stock held by decedent on her date of death were valued on the estate tax return at $ 423 per share. The 16,240 shares of nonvoting common stock were valued at $ 381 per share. The total value stated on the estate tax return was $ 8,560,470. The 17.6 common stock shares of Television Wisconsin, Inc., held by decedent on her date of death were valued at $ 1,965 per share, for a total value of $ 34,584. The gift tax return also valued the voting shares of Evening Telegram Company stock at $ 423 per share. 2. The Family
The Evening Telegram Company (ETC) was incorporated in Wisconsin in 1897 by J. T. Murphy, decedent's father-in-law. It published the Evening Telegram and conducted a general printing business. The Evening Telegram Company is authorized to acquire, own, sell, lease, or operate radio and television stations, and related property. Decedent's husband, Morgan Murphy, followed his father as president of the Evening Telegram Company. He became involved in radio broadcasting and later in television broadcasting. The Evening Telegram Company brought radio to Duluth, Minnesota, and Superior, Wisconsin in 1926. *530 He developed or acquired all of the Evening Telegram Company's current broadcast and newspaper facilities prior to his death on February 6, 1971. Morgan Murphy died testate. Prior to his death, he held all of the outstanding shares of Evening Telegram Company. His will established a marital trust for decedent and a residuary trust for their two children. The Evening Telegram Company shares held by Morgan Murphy were passed to the trusts under the terms of the will. Decedent was given a general power of appointment over the assets of the marital trust. The marital trust's principal asset was a controlling block of stock of the Evening Telegram Company. Decedent was born on May 21, 1906. She and her husband, Morgan Murphy, had two children, Elizabeth Burns (formerly Elizabeth Schirmer), born December 4, 1945, and John Murphy, born April 30, 1948. 3. The Plan to Transfer Decedent's Control of the Business to Her Children
Decedent became the president of the Evening Telegram Company in 1971. She desired to continue the entire operation, and wanted it eventually to be owned and managed by her children. She was also chairman of the board of directors in 1980 when her *531 son, John Murphy, became president of the Evening Telegram Company, and her daughter, Elizabeth Burns, was made vice president. Elizabeth Burns also became president of the broadcast subsidiaries in 1981. Decedent remained chairman of the board until her death in 1982. Decedent wanted 100 percent of the Evening Telegram Company stock to remain in the Murphy family. This had also been Morgan Murphy's wish. She wanted her children, John and Elizabeth, to take over the business. The company had been operating for 90 years, and decedent wanted no changes. There was no formal agreement to limit Evening Telegram stock ownership to Murphy family members, but decedent's wishes were clearly understood by her two children and Mr. Anderson, trustee of the Murphy family trusts. Around 1973, Warren Randy, decedent's tax adviser and certified public accountant, advised decedent to make gifts to her children to decrease her ownership from about 65 percent of Evening Telegram Company stock to about 51 percent. Decedent followed that advice in 1975 with a gift of 750 shares to trusts for her children. This reduced decedent's holdings to 51.41 percent. From 1979 to 1982, Mr. Randy advised *532 petitioner to make a small additional transfer to the children to obtain a minority discount while retaining control between the three of them at all times. In 1979, Mr. Randy advised decedent to exercise her power of appointment to transfer enough Evening Telegram Company voting stock to her children so that she would no longer have a majority of the stock. In a memorandum dated May 9, 1979, Mr. Randy said: The objective at this time is to reduce the voting control of the Evening Telegram Company to under 50% so as to reduce the valuation of the estate of Mrs. Murphy. * * * Lastly, the disadvantage of reducing Mrs. Murphy's voting stock holdings should be considered. Under the first alternative even though she will have a minority interest at the level of 49% she and the bank or she and the children will have control of the corporation. * * * On February 22, 1980, Mr. Randy wrote a letter to Mrs. Murphy again proposing to reduce voting shares to less than 50 percent, noting, "Between you, John and Elizabeth, you would have 51% of the voting stock of the Evening Telegram Company." Mr. Randy explained his recommendation as follows: I have suggested that the gifts *533 be made directly to the children instead of into the presently existing trusts for two reasons. 1. It allows you and the children to have control as against the bank. While you are a trustee of the residuary trust and you could actually draw out the stock held by the marital trust, I am not sure that you will want to remain as a trustee necessarily in the future. Therefore, even though the bank had complete control of the residuary trust, you and the children still would have the majority of the stock. 2. In valuing the gift, I will be taking a discount for a minority interest, which I computed at the same 20% that I computed for valuing the stock held in your estate. There have been some cases where the IRS contended that a gift of stock which put the donee into a majority status has great value because it gives control. While this is a remote possibility in this particular situation because the control would only be in the hands of the bank as trustee and not as actual owner, I still thought it might be well to avoid even the possibility of this kind of an argument being raised. Fourteen or fifteen months before her death, decedent was diagnosed with lung cancer. She *534 also was suffering from obstructive pulmonary disease. A year before her death, she had an operation to remove a cancerous growth from one of her lungs. She also had been receiving radiation treatments and was hospitalized six or seven times after the cancer was diagnosed. Mr. Randy continued to advise decedent to transfer some stock of the Evening Telegram Company. On July 23, 1982, Mr. Randy prepared a memorandum recommending the transfer of two .88 percent blocks (100 shares each) of Evening Telegram Co. stock to each of decedent's two children. The memorandum estimated the transfer tax savings from using a minority discount. In the memorandum Mr. Randy said: Dear Mrs. Murphy: Last week, Dick Burns and I discussed with you the possibility of your making a gift of Evening Telegram and Mesabi Publishing Company voting stock to John and Liz. We discussed possible estate tax savings that would be involved if you did not own a majority of the voting stock of either of these two companies. We made some rough estimates of the estate tax involved, but we decided that computations should be made by me that would more accurately reflect the possible results of the change from *535 majority status to minority status in your holdings. I have now made the computation based in valuing Evening Telegram Company at 7-1/2 times cash flow. I believe this is a high figure, but I am using it only for purposes of this computation. A lower figure would not result in a great deal of difference in the savings amount. Based on this formula, the value of the Evening Telegram and its subsidiaries comes out to be just under $ 53,000,000. With a total of 56,500 shares, this is a value of $ 936 per share. You own 22,050 voting and nonvoting shares, which would place the value of your stock, without any discount, at about $ 20,600,000. The estate tax on this for federal purposes only is a little over $ 10,000,000. If you do not have voting control of the Evening Telegram Company and we can sustain a 10% discount on that account, the estate tax savings would be slightly over $ 1,000,000. At a 20% discount, it would be about $ 2,000,000. A 30% discount would result in a saving of $ 3,000,000. * * * On July 29, 1982, decedent exercised her power of appointment and transferred 100 shares of Evening Telegram Company voting stock from her marital trust directly to each of *536 her two children. The transfers reduced the marital trust voting shares of Evening Telegram Company stock from 51.41 percent (5,810 shares) to 49.65 percent (5,610 shares). The only purpose for the two gifts of 100 shares each was the anticipated tax benefit. Decedent was attempting to avoid Federal transfer taxes on the premium value of the controlling interest in the Evening Telegram Company, control over which she held by virtue of a power of appointment since 1971, and which her husband held before that. She attempted to do so by fragmenting her control block with transfers of the 200 shares to her children. In her will, decedent exercised her general power of appointment over the remaining assets of the marital trust (i.e., the 49.65-percent block of stock) in favor of trusts which she established for her children's benefit. Decedent intended to keep the companies operating, and to pass them to her children, John Murphy and Elizabeth Burns. At the time of her death, her desire for continuous family control had been fulfilled. Decedent, both of her children, and the trustee of the Murphy trusts all clearly intended to keep control of the family business in the family. *537 4. The Evening Telegram Company and its Subsidiaries
Prior to December 16, 1976, the authorized capital stock of the Evening Telegram Company consisted of 25,000 shares of voting common stock with a par value of $ 100 per share. On December 16, 1976, the Evening Telegram Company's Articles of Organization were amended to authorize 50,000 shares of nonvoting common stock with no par value. From that date to the date of decedent's death, the outstanding stock of the Evening Telegram Company consisted of 11,300 shares of voting common stock and 45,200 shares of nonvoting common stock. The voting stock and the nonvoting stock of the Evening Telegram Company are identical other than voting rights and par value. Under its Articles of Organization, a two-thirds majority of all outstanding voting shares was required to sell off substantially all the operating divisions and operating subsidiaries of the Evening Telegram Company. We have considered the consolidated earnings of the Evening Telegram Company and its subsidiaries for the years 1979, 1980, 1981, and 1982, the stockholders' equity in the Evening Telegram Company and its subsidiaries as of December 31, 1981, and December 31, 1982, and *538 also the total dividends and dividends per share paid by the Evening Telegram Company from 1979 to 1982. As of August 16, 1982, the Evening Telegram Company published the Evening Telegram and operated a commercial printing division. The remainder of the Evening Telegram Company's communications operations were carried on through subsidiary corporations as follows: Corporate Entity
Location
Paper/Station
H.T.C., Inc.
Hibbing, Minnesota
Hibbing Tribune
Ashland Publishing Corp.
Ahland, Wisconsin
Daily Press
Spokane Television, Inc.
Spokane, Washington
KXLY-TV
Fargo, North Dakota
KTHI-TV
Spokane Radio, Inc.
Spokane, Washington
KXLY-AM-FM
Apple Valley
Yakima, Washington
KAPP-TV
Broadcasting, Inc.  Kennewick, Washington
KVEW-TV
Television Wisconsin, Inc.
Madison, Wisconsin
WISC-TV
The Evening Telegram Company owned 100 percent of the common stock of all of these companies, except Apple Valley Broadcasting, Inc., in which it held 86.8 percent of the stock at decedent's death, and Television Wisconsin, Inc., in which it then held 84.4 percent of the stock. Spokane Television, Inc., also held 100 percent of the common *539 stock of Spokane Radio, Inc. The Evening Telegram Company did not hold its broadcast or newspaper related assets for investment and would not be considered a holding or investment company by potential investors. Before the gifts of Evening Telegram Company stock made on July 29, 1982, of .88 percent of the voting stock (100 shares) to each of decedent's children, the voting and nonvoting stock were held as follows: Voting Stock
Nonvoting Stock
Shareholder
Shares
Percentage
Shares
Percentage
Morgan Murphy Marital
Trust  5,810 51.41 16,240
35.93 Morgan Murphy Residuary
Trust  3,990 35.31 15,960
35.31 1975 Trust for the
Benefit of John  Murphy and Children  750   6.64  5,000 11.06 1975 Trust for the
Benefit of Elizabeth  Burns and Children  750   6.64  6,500 14.38 1976 Trust for the
Benefit of the  Children of John  Murphy  1,500 3.32  Totals
11,300
100.00
45,200
100.00
As of August 16, 1982, decedent's date of death, the Evening Telegram Company stock was held as follows: Voting Stock
Nonvoting Stock
Shareholder
Shares
Percentage
Shares
Percentage
Morgan Murphy Marital
Trust  5,610 49.65 16,240
35.93 Morgan Murphy Residuary
Trust  3,990 35.31 15,960
35.31 1975 Trust for the
Benefit of John  Murphy and Children  750  6.64  5,000 11.06 1975 Trust for the
Benefit of Elizabeth  Burns and Children  750  6.64  6,500 14.38 1976 Trust for the
Benefit of the  Children of John  Murphy  1,500 3.32  Elizabeth Burns
100   .88   John Murphy
100   .88   Totals
11,300
100.00
45,200
100.00
*540 5. Television Wisconsin, Inc. (WISC-TV) Stock
Television Wisconsin, Inc., established in 1956, operated the VHF television station WISC-TV in Madison, Wisconsin. In 1982, it became a CBS network affiliate. It had the business advantage of competing with two lesser powered UHF network affiliated television stations in Madison. It was a well-run station, with good physical equipment in an attractive market. When established, 50 percent of the corporation was owned by several residents of Madison, and the other 50 percent was controlled by Morgan Murphy. Two-thirds of Morgan Murphy's interest was owned by the Evening Telegram Company. The remaining one-third was owned by Morgan Murphy personally. A voting trust was established for the residents' 50-percent ownership. Each 50-percent ownership elected two members to the board of directors. In 1975, the Evening Telegram Company purchased an additional 17.6 shares for $ 725 per share. The shares represented .4 percent of the common stock of Television Wisconsin, Inc. (17.6 of 4,250 shares). During the 1979 and 1980 period, all of the Madison shareholders sold their stock to the Evening Telegram Company for $ 2,000 per *541 share. We have considered cash flows and earnings of Television Wisconsin, Inc. As of August 16, 1982, the single class of Television Wisconsin, Inc. stock was held as follows: Percentage
Shareholder
Shares
of Shares
Evening Telegram Company
3,586.4
84.39 Morgan Murphy Residuary
Trust  181.0
4.26  1975 Trust for the
Benefit of John Murphy  and Children  232.5
5.47  1975 Trust for the
Benefit of Elizabeth  Burns and Children  232.5
5.47  Elizabeth B. Murphy
17.6
.41   Totals     4,250.0
100.00
The average earnings of Television Wisconsin, Inc., for the 1980 through 1982 period were $ 1,055,277. Thus, the earnings per share were $ 248.30. Petitioner placed a per share value of $ 1,965 on the estate tax return. Respondent's notice of deficiency placed a per share value on the stock to be $ 5,809.03. Petitioner and respondent employed experts to assist in valuation of the stock of the Evening Telegram Company and Television Wisconsin, Inc. The reports and testimony of experts are discussed below. 6. Summary of General Findings of Fact
a. Decedent was president *542 of the corporation until 1980. She was chairman of the board from 1980 until her death. Her son became president in 1980. Her daughter became vice president in 1980 and president of the broadcast subsidiaries in 1981. b. It was the clearly understood intention of the Murphy family and the trustee of the Murphy family trusts to keep control of the business in the family. c. Decedent had a power of appointment over a controlling block of the stock of Evening Telegram Company from her husband's death in 1971 until shortly before her death in 1982. d. Eighteen days before her death, decedent fragmented her control block into a block of 49.65 percent and two blocks of .88 percent (100 shares) each. The two .88 percent blocks were lifetime gifts to her children. She continued as chairman of the board, and retained the 49.65 percent block until her death. It was then conveyed by exercise of her power of appointment to trusts for the benefit of her children. e. Decedent's tax adviser, Mr. Warren Randy, repeatedly urged her to make a small lifetime transfer of stock to her children. The only intended purpose was to make decedent's control of the corporation appear to disappear, *543 to obtain a minority discount. f. Decedent's fragmentation of her control block by gift of two .88 percent blocks to her children 18 days before her death did not substantially affect her beneficial interest in the corporation. The only intended effect was to obtain a minority discount for the control block. II. FINDINGS OF FACT AND OPINION REGARDING VALUATION We will next make findings of fact and opinion relating to valuation of stock of the Evening Telegram Company and for Television Wisconsin, Inc., other than issues relating to discounts. Later in the opinion we will decide whether to allow discounts in valuing the stock of the Evening Telegram Company and Television Wisconsin, Inc. A. VALUE OF THE EVENING TELEGRAM COMPANY STOCK BEFORE DISCOUNTS
1. Introduction
Property is included in the gross estate at its fair market value, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; *544 United States v. Cartwright, 411 U.S. 546, 551 (1973). The willing buyer is a purely hypothetical figure and valuation does not take into account the personal characteristics of the actual recipients of the stock. Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981). If the property is stock that is not listed on an exchange and cannot be valued with reference to bid and asked prices or historical sales prices, the value of stock in comparable corporations engaged in the same or a similar line of business must be considered. Section 2031(b). Also considered are the corporation's management, net worth, earnings, ability to pay dividends, and other relevant factors. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). Although the valuation dates for gift and estate taxes were 18 days apart, petitioner used the same value for Evening Telegram Company stock for both valuation dates. Respondent also assumed the values on the different valuation dates to be the same. There is nothing in the record to indicate a change in value during that period. Accordingly, we apply the same per-share value to the gift of *545 voting Evening Telegram Company stock made on July 29, 1982, as to the same stock on her date of death. Respondent's Revenue Ruling 59-60, 1959-1 C.B. 237, has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value of shares of stock in closely held corporations for estate and gift tax purposes. It gives the following nonexclusive list of factors to be considered if market quotations are not available for the stock: (a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. (c) The book value of the stock and the financial condition of the business. (d) The earning capacity of the company. (e) The dividend-paying capacity. (f) Whether or not the enterprise has goodwill or other intangible value. (g) Sales of the stock and the size of the block of stock to be valued. (h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over the counter. *546 Rev. Rul. 59-60, supra at 238-239. The determination of the fair market value of stock for tax purposes is a question of fact. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347, cert. denied 377 U.S. 993 (1964). At trial, we received opinion evidence testimony from many expert witnesses. We weigh that testimony in light of the experts' qualifications as well as all the other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court; Estate of Gilford v. Commissioner, 88 T.C. 38, 56 (1987). Nonetheless, we are not bound by the opinion of any expert witness and will accept or reject expert testimony in the exercise of sound judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); *547 Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). The varied approaches used by the experts here show that caution is necessary in weighing expert valuations that attempt "to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise," Messing v. Commissioner, 48 T.C. 502, 512 (1967); Estate of Hall v. Commissioner, supra at 338. We may accept an expert's opinion or we may reject testimony that is contrary to our own judgment, especially where the witness' opinion of value is so exaggerated that the testimony is incredible. Estate of Hall v. Commissioner, supra at 338; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). This part of the opinion decides the valuation of decedent's Evening Telegram Company stock before consideration of discounts. Discounts are discussed separately later. 2. Petitioner's Experts
a. Warren Randy
Warren Randy, a certifed public accountant, is a retired partner of Grant Thorton, a large international accounting firm. He prepared the estate and gift tax returns which are before the Court. He has greater *548 personal knowledge of the Evening Telegram Company than any other expert here due to his long professional association with the company and the Murphy family. Respondent argues that Mr. Randy is not a neutral observer because of this long association. However, we think that long association gives him an advantageous insight into the workings of the business with respect to his report, but we do not give it any additional weight in view of our other observations and the fact that he may have become somewhat biased as a result of that long association. On July 23, 1982, Mr. Randy wrote a letter to decedent recommending that she transfer small blocks of stock to her two children. His letter estimates a value for the Evening Telegram Company of 7 1/2 times cash flow. He said this was "high," and he was using it "only for purposes of this computation," but that a lower figure would not result in a great deal of difference in the tax savings that would result if a minority discount were applied. Based on this assumption, his letter states that the value of Evening Telegram Company stock was $ 53 million or $ 936 per share before discount. Mr. Randy's expert report concluded that *549 the per share value was $ 423 for voting stock and $ 381 for nonvoting stock. He used an average based on an asset sale method, a comparable stock method, and a liquidation method, and then allowed discounts. First, using an asset sale method, Mr. Randy valued the individual holdings of the Evening Telegram Company. He used the 7.5 multiple that he obtained from Blackburn and Company and applied it to cash flow. This provides a going concern factor. He then added assets of cash, receivables, and intangibles such as goodwill and the FCC licenses. Liabilities were then subtracted. He valued the publishing stock at $ 5,481,211 and the broadcasting stock at $ 45,308,000. The total value was $ 50,789,211. Dividing this total by the 56,500 outstanding shares yields $ 898.92 per share, before applying a discount. This is reasonably close to Mr. Randy's $ 936 per-share estimate made in his July 23, 1982, letter to decedent. Mr. Randy then applied a 35-percent discount for lack of control and lack of ownership of two-thirds of the stock to substantially liquidate the corporations. This yielded $ 584.30 per share. Second, Mr. Randy applied the liquidation proceeds method. He used *550 book values for the assets under this method. This method produced an estimated per-share stock value of $ 348.63. Mr. Randy applied a 20-percent discount to this, yielding a per stock value of $ 278.90. The method does not include any value for goodwill, other intangible assets, and earnings, and thus does not reflect going concern value. We believe that this corporation has going concern value, and this method significantly understates its value. Thus we do not rely on it. Third, Mr. Randy used the comparable stock method. It is based on his selection of seven other communications corporations from Barron's, averaging their price-to-earnings ratios, and applying the average ratio to the Evening Telegram Company's earnings divided by the number of outstanding shares. This produced a per-share value of $ 477.44. Mr. Randy discounted this by 15 percent for lack of marketability yielding a value per share of $ 405.82. We believe use of a comparable stock analysis is appropriate here, but we agree with respondent that the stock selected and the specific methodology used understates the value of Evening Telegram Company stock. b. Joseph M. Sitrick
Joseph M. Sitrick, *551 vice president of Blackburn and Company, was retained by petitioner to determine the fair market value of the Evening Telegram Company's broadcast properties, but not the newspapers, as of August 16, 1982. He is very knowledgeable of the broadcasting industry, in which he has been a broker for the past 30 years. Petitioner's other experts relied upon multiples of cash flow provided by his company. Mr. Sitrick used an asset sale method valuation, which is the practice of his firm and the standard method of valuation in the broadcast industry. He believed that brokers of broadcast properties use an asset sale method almost exclusively. The asset sale method that he used considers earnings, economic climate, competitive situation, market conditions, and interest rates, as well as asset values. Mr. Sitrick first determined the asset value of each station, then converted that value into a value for the stock. He examined financial data of the television and radio stations provided by Mr. Randy. He visited the stations and interviewed personnel. He considered the factors of the facilities, competition, management, projections, and share of the market for each station in arriving *552 at his multiple for each station. Mr. Sitrick concluded that a different multiple should be applied to each station. Yakima had the lowest multiple because of the depressed economic condition and bad condition of equipment. In Mr. Sitrick's opinion, Fargo Grand Forks, KTHI TV, North Dakota, needed much equipment upgrading. It had the lowest network rate in the market. He valued it at $ 4 million. The television station KXLY in Spokane, Washington, was in great need of upgrading physical assets. It also had a signal problem. The station was getting bad press. Mr. Sitrick valued it at $ 19 million. Mr. Sitrick also appraised the radio stations. He used factors similar to those used with television stations. He valued the AM/FM radio station KXLY in Spokane, Washington at $ 1.2 million. He valued television stations KAPP-TV in Yakima and KBEW-TV in Kennewick at the combined total of $ 4.5 million. Mr. Sitrick then converted the asset values into stock values for the television and radio stations. He determined that the various subsidiary corporations of the Evening Telegram Company had fair market values on August 16, 1982, before applying any minority discount as follows: *553 Television Wisconsin, Inc.
$ 19,938,332
Apple Valley Broadcasting, Inc.
3,490,301
Spokane Television, Inc.
30,127,958
KTHI-TV, Fargo, North Dakota
4,893,691
Spokane Radio, Inc.
1,553,818
Total          $ 60,004,100
He then applied a 40-percent minority discount. Mr. Sitrick did not value the Evening Telegram Company's publishing holdings. c. Robert M. Leonhardt
Petitioner's expert, Robert M. Leonhardt, vice president of the regional investment banking firm of Robert W. Baird, Inc., based his valuation upon his projection of the amount decedent's estate could have realized from a hypothetical public offering of the block of stock. He applied a method similar to Mr. Randy's comparable sales method. He used a price-to-earnings ratio of 10.9:1. The last 12 months' earnings multiplied by 10.9 equaled $ 475 per share. This was to be reduced for costs and risks of public offerings. Baird would then recommend a 40-to-1 split or $ 12 per share to provide an incentive for trading. Mr. Leonhardt concluded that the total proceeds would be about $ 10.48 million from a public offering of the stock. He then subtracted $ 760,380 as an *554 underwriter's discount of 7.25 percent, $ 300,000 for public offering expenses, and $ 419,520 as risk discount of 4-percent yielding about $ 9,000,000 to the estate. The per-share value ($ 9,000,000 divided by 56,500 shares) is $ 159.29. Mr. Leonhardt did not make an independent valuation of the Evening Telegram Company assets, nor did he make inquires of customers, competitors, or others. Instead, he relied, without independent verification, upon the accuracy and completeness of the qualitative and financial data from the Evening Telegram Company and Mr. Randy. He also reviewed the valuations of Mr. Randy, Mr. Sitrick, and Mr. John Hurlbut. In a private sale, Mr. Leonhardt would apply a 35-percent discount for lack of marketability and "blockage." We believe Mr. Leonhardt's method is entitled to some consideration, but we give it less weight than the asset sales methods used by the experts here. d. James R. Cerone
Petitioner's expert, James R. Cerone, based his valuation primarily on an estimate of the present value on August 16, 1982, of the corporation's projected dividends through 1992, and an estimate of the present value on August 16, 1982, of the corporation's *555 projected sale value as of December 31, 1992. He assumed that the block was a minority block where the buyer would have very little possibility of obtaining control. Mr. Cerone classified these cases as venture capital investments because of the high degree of speculation that the buyer could obtain control. At the time, such venture capital investments had rates of return from 25 to 60 percent. He decided on a 30-percent rate as to the prospect of obtaining a controlling interest and set that rate as the appropriate discount rate. Mr. Cerone determined a present value of projected dividends of $ 17,715,000 based on a 20.5-percent discount rate, assuming dividends distributed on December 31. Mr. Cerone determined that the total value of operating assets was $ 31,995,000. This value was divided by the total number of outstanding shares, yielding $ 566 per share. Nonvoting shares were valued at $ 544 per share, 4 percent less than voting shares. A lack of marketability discount of 15 percent was applied because the base information was derived from public markets. The lack of marketability discount is also applicable to minority interests in closely held corporations because *556 the holding lacks liquidity. This discount is applied to a minority interest (as opposed to controlling interest) base. His final valuation was $ 481 per share for voting common stock, and $ 462 per share for nonvoting stock. We note that small errors in discount rates can result in large overall errors. However, on balance, we believe that use of this method is entitled to some weight here. 3. Respondent's Experts
a. John Hurlbut
Mr. John F. Hurlbut had an extensive background in the newspaper and broadcasting industries. Like Mr. Sitrick, Mr. Hurlbut believed that the asset sale method was appropriate and commonly used in the broadcast industry. Assets assumed to be conveyed in such a sale include land, buildings, leases, network agreements, contracts, columns, feature rights, trademarks, going business concern, and goodwill. He also applied multiples of gross profits before taxes and cash flow for television stations, radio stations, and daily newspapers. Mr. Hurlbut's multiples were as follows: Gross
Profits
Cash Flow
Television stations
2-5
10-40
7.5-15
Radio stations
1.5-3
10-20
7.5-10
Daily newspapers
1.5-3
--
7.5-10
*557 Using an asset sale method of valuation, Mr. Hurlbut valued the Evening Telegram Company at $ 67,396,506 as of August 16, 1982, before applying any adjustments for cash sale. He considered comparable stock, the market, economic conditions, and earnings, in addition to asset values. He also added cash, investments, accounts receivable, and other going concern factors not conveyed in a sale of assets. He concluded that the fair market value of the Evening Telegram Company as a going concern was equal to the value of those subsidiarie and divisions. Mr. Hurlbut's estimate was on a term price basis rather than cash. Mr. Sitrick testified that the term price would be 25 percent higher than the cash price in August 1982. Petitioner points out that Mr. Hurlbut assumed that a write-up under section 334(b)(2), as in effect on the valuation date, would be available here. Under section 334(b)(2) the corporate distributee of a subsidiary that is liquidated may "write up" the assets, e.g., for depreciation. Petitioners assert that since the decedent owned less than 80 percent, such write-up was not available to the hypothetical buyer of her stock. Mr. Cate, whose report is described next, *558 also acknowledged his selection of multiples did not take into account the inability to write up assets. Their testimony suggests that their valuations may well have been lower if they had considered this factor. However, there may be disadvantages to the shareholders, such as recognition of gain under prior section 337(c)(2)(B). On balance, we give little weight to Mr. Hurlbut's and Mr. Cate's failure to consider this factor. b. William N. Cate
Respondent's other expert, William N. Cate, is president and chief executive officer of Chapman Associates. Chapman Associates is a business broker specializing in the sale of media properties. Mr. Cate did not value the publishing operations of the Evening Telegram Company. Essentially, Mr. Cate calculated the net value of the broadcast properties of the Evening Telegram Company by adding asset sale value to additional assets and subtracting liabilities. He then assumed that the stock here is a control block, and added a control premium of more than 25 percent to the value of the stock. He concluded that the net value of all of the Evening Telegram Company broadcast properties was $ 52,756,646. He used Mr. Hurlbut's $ 7,349,739 *559 estimate for the net value of the publishing properties. Mr. Cate's estimate of the total fair market value of the Evening Telegram Company as of August 16, 1982, is $ 60,106,385. His estimate of the per-share value of the Evening Telegram Company stock on August 16, 1982, was $ 1069. 4. Value Before Discounts - Conclusions
The following summarizes the results shown by the asset sale methods used by two experts for each party: Petitioner's Experts
Respondent's Experts
DESCRIPTION
RANDY
SITRICK
HURLBUT
CATE
Publishing
ETC
$ 3,403,000 $ 2,650,000 HTC
1,330,000
1,950,000
WCP
447,128
696,506
Ashland Pub.
301,083
975,000
Subtotal    5,481,211
* 5,481,211
6,271,506
** 7,349,739
Broadcasting
KXLY-TV
21,715,000
30,127,958
23,500,000
24,381,627
KTHI-TV
3,137,000
4,893,691
6,850,000
4,953,917
KXLY-AM/FM
1,133,000
1,553,818
1,650,000
1,453,818
KAPP-TV/
3,117,000
3,490,301
6,375,000
3,380,427
KVEW-TV
WISC-TV
16,206,000
19,938,332
22,750,000
18,586,857
Subtotal  45,308,000
60,004,100
61,125,000
52,756,646
TOTAL  50,789,211
65,485,311
67,396,506
60,106,385
Per Share  (Tot/56,500)  $ 899       $ 1,159     $ 1,192     $ 1,069     *560 These four pre-discount per-share values can be compared with Mr. Randy's $ 477.44 (comparable stock) and $ 348.63 (liquidation), Mr. Leonhardt's $ 159.21 (public offering), and Mr. Cerone's $ 566 (projected dividends). We agree with petitioner that some weight should be given to more than an asset sale method, and so we also take into account the comparable stock, public offering, and projected dividends methods. Greater reliance on the asset sale method would be indicated if the Evening Telegram Company were viewed as a holding company. We believe it has characteristics of both a holding company and an operating company, but its characteristics as an operating company are equally or more significant. For example, petitioner's expert witness, Mr. Cerone, testified that: In the case of the Evening Telegram, it was actively engaged in the management of the subsidiary corporations, *561 of its subsidiary corporations. It had made changes in the management of those subsidiaries. It determined what the budgets of those subsidiaries were. How much [of] the capital of the total corporate consolidated enterprise was going to be allocated for capital expenditures of those subsidiaries. It was actively engaged in the management of the operations and finances of those subsidiaries. See also Rev. Rul. 59-60, supra at 242-43. Upon consideration of all the facts and circumstances in the entire record, and giving the due weight to the various opinions of the experts, we conclude that on July 29, 1982, and August 16, 1982, the per-share value of Evening Telegram Company stock was $ 825, before allowing for discounts. B. VALUATION OF TELEVISION WISCONSIN, INC. STOCK
Petitioner placed a per-share value of $ 1,965 on the estate tax return. Respondent's notice of deficiency placed a per-share value on the stock of $ 5,809.03. 1. Discounts
Decedent purchased .41 percent (17.6 shares) of Television Wisconsin, Inc. stock in 1975. As of August 16, 1982, the single class of Television Wisconsin, Inc. stock was held by the Evening Telegram *562 Company (84.39 percent), Morgan Murphy Residuary Trust (4.26 percent), 1975 Trust for the Benefit of John Murphy and Children (5.47 percent), 1975 Trust for the Benefit of Elizabeth Burns and Children (5.47 percent), and Elizabeth B. Murphy (.41 percent). This presents the issue whether, in valuing decedent's .41- percent block, to take into account that the Evening Telegram Company, of which decedent was chairman of the board until her death, owned 84.39 percent of the stock of Television Wisconsin, Inc. Petitioner argues that it should not be taken into account. Mr. Randy applied a minority discount to the Television Wisconsin, Inc. stock of 35 percent. Petitioner's expert from Blackburn, Mr. Joseph Sitrick, applied a 40 percent minority discount. Respondent argues that decedent's Television Wisconsin, Inc. stock should be valued in conjunction with the Evening Telegram Company's block of Evening Telegram Company stock because it is reasonable to assume that the sale of the blocks would be coordinated to enhance their value. The Evening Telegram Company owned 84.39 percent of Television Wisconsin, Inc., on August 16, 1982. *563 Decedent was chairman of the board of the Evening Telegram Company. We believe it is reasonable to conclude that, if Television Wisconsin, Inc. stock were to be sold, the sale of decedent's .41-percent block would be coordinated with the sale of the ETC's control block to maximize the sale price of all Television Wisconsin, Inc. stock in which decedent had an interest. See Estate of Curry v. United States, 706 F.2d 1424, 1429 (7th Cir. 1983). Thus, we believe that whether petitioner receives a minority discount or other discounts for decedent's block of Television Wisconsin, Inc. stock should be decided consistently with the discounts allowed for decedent's Evening Telegram Company stock. 2. Valuation of Television Wisconsin, Inc. Stock Before Consideration of Discounts
We disagree with the opinion of respondent's expert, Mr. William N. Cate, that "this stock would have no market value other than if it were part of a majority block of stock which was being sold." We also reject Mr. Cate's per-share value of $ 5,181.73, which was based on liquidation of Television Wisconsin, Inc. Respondent's other expert, Mr. Hurlbut, used multiples of gross billing average, *564 profit average, and cash flow, as well as asset sales to arrive at $ 20 million as the fair market value of Television Wisconsin, Inc., as of August 16, 1982. Petitioner argues that we should disregard Mr. Hurlbut's report as relying too heavily on asset sales. Television Wisconsin, Inc., is a going concern; thus we put more of an emphasis on earnings. Mr. Hurlbut appropriately considered earnings and other going concern factors as well as asset sales in his opinion. All of petitioner's experts relied upon Blackburn and Company, Inc., to provide multiples of cash flow to determine their respective values. Mr. Sitrick of Blackburn and Company, Inc., valued Television Wisconsin, Inc. stock to be $ 19,938,332 as of August 16, 1982. He emphasized earnings and asset sales. We conclude that the fair market value of Television Wisconsin, Inc. stock as of August 16, 1982, was $ 19,938,332. Dividing $ 19,938,332 by the 4,250 outstanding shares yields $ 4,691.37 per share before consideration of any discounts. III. OPINION -- DISCOUNTS AND RELATED ISSUES Petitioner applied a minority discount to the stock, and respondent valued it as a control block. However, the record includes *565 statements by the experts for and against allowance of discounts in addition to a minority discount. Accordingly, we will consider application of a minority discount, a discount for lack of marketability, and a discount because petitioner owned less than two-thirds of the stock of the Evening Telegram Company and thus, under Wisconsin law, could not sell substantially all of the assets of the Evening Telegram Company. A. DISCOUNT BASED ON LACK OF MARKETABILITY AND THE WISCONSIN STATUTE LIMITING ASSET SALES
Minority discounts and discounts for lack of marketability are often discussed together, but are distinguishable. Shares of corporate stock which represent a minority interest may be worth less than a proportionate share of the value of the assets of the corporation. Harwood v. Commissioner, 82 T.C. 239, 267-268 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986), cert. denied 479 U.S. 1007 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 957 (1982); *566 Estate of Zaiger v. Commissioner, 64 T.C. 927, 945-946 (1975). A minority discount may be an appropriate way to reflect the lesser value of noncontrol blocks of stock. A minority discount is distinguished from a discount for lack of marketability, as discussed below at paragraph B. A discount could also be allowed because of limits imposed by Wisconsin law on sales of substantially all of the assets of the corporation. Minority discount issues are discussed below at paragraph B. We have noted the distinction between a minority discount and a discount for lack of marketability, as follows: The minority shareholder discount is designed to reflect the decreased value of shares that do not convey control of a closely held corporation. The lack of marketability discount, on the other hand, is designed to reflect the fact that there is no ready market for shares in a closely held corporation. Although there may be some overlap between these two discounts in that lack of control may reduce marketability, it should be borne in mind that even controlling shares in a nonpublic corporation suffer from lack of marketability because of the absence of a ready private *567 placement market and the fact that flotation costs would have to be incurred if the corporation were to publicly offer its stock. * * * Estate of Andrews v. Commissioner, supra at 953. Two of petitioner's exprts, Mr. Randy and Mr. Cerone, specifically mentioned the discount for lack of marketability. Mr. Randy applied a 15-percent discount for lack of marketability to his comparable stock method. Mr. Cerone applied a 15-percent discount for lack of marketability because he thought that the stock ownership interest was not readily convertible to cash. Mr. Leonhardt applied a 35-percent discount for the combined effect of lack of marketability and the difficulty of selling a large block ("blockage") if the sale were a private sale. In these cases, the Murphy family desired to retain ownership of the Evening Telegram Company. We believe they would have wanted to buy decedent's stock had it been sold. To the extent the family could afford to buy the stock there would have been a market for it. See *568 Luce v. United States, 4 Cl. Ct. 212, 220-221 (1983). However, in Luce, there was an actual offer from family members to buy stock, Luce v. United States, supra at 221. That is not present in these cases. Considering the facts here and the Luce rationale, we think no reduction in the discount for marketability that would otherwise apply is appropriate. Under Wisconsin law and the Evening Telegram Company Articles of Organization, a two-thirds majority of the outstanding voting shares is required to sell substantially all the operating divisions and operating subsidiaries of the Evening Telegram Company. Wisconsin Statutes section 180.71 (1987-88), provide that any "sale, lease, exchange or other disposition of all, or substantially all, the property and assets, with or without goodwill" of a corporation requires the affirmative vote of two-thirds of the voting shares of the corporation. Decedent's block of Evening Telegram Company stock is less than a two-thirds majority of all outstanding voting shares. Thus, decedent during her life would not have the ability to compel liquidation, one of the features of control. *569 Harwood v. Commissioner, supra at 267. We believe a discount for the lack of ability to compel liquidation is appropriate. Petitioner argues that a further decrease in value should be recognized because decedent's block of stock was less than 80 percent. We do not allow a further discount for this factor for reasons given with the discussion of Mr. Hurlbut's expert report. We do allow an increased discount to reflect the inability of the holder of the 49.65-percent block to liquidate. The experts did not quantify this factor separately. All of petitioner's experts mention the restriction but none state a specific discount for it. Blackburn and Mr. Sitrick considered it in their selection of multiples. Mr. Leonhardt considered it in arriving at his value. Mr. Randy considered it a part of his 35-percent discount for lack of control. Based on the entire record, we conclude that an appropriate discount for lack of marketability and liquidation restrictions is 20 percent. Applied to the nondiscounted Evening Telegram Company per-share stock value of $ 825, the lack of marketability and liquidation restrictions discounted value is $ 660. Applying the 20-percent *570 discount to Television Wisconsin, Inc. stock valued at $ 4,691.37 per share before lack of marketability and liquidation restrictions discounts as of August 16, 1982, yields a $ 3,753.10 per-share value after such discounts. Technically, it may be appropriate to reduce the discount for the Television Wisconsin, Inc. stock since decedent's block, directly and through the Evening Telegram Company, exceeded two-thirds, sufficient to meet the required vote to liquidate substantially all the assets of Television Wisconsin, Inc. However, neither party asked us to make this distinction, and we do not reach this issue. B. MINORITY DISCOUNTS
1. Introduction
Petitioner's argument for application of a minority discount here is simple enough. Petitioner argues the following. On July 29, 1982, before her death, decedent made a gift of .88 percent of the stock to each of her two children. Those are minority blocks, and should be allowed a minority discount. At her death on August 16, 1982, she exercised a power of appointment for 49.65 percent of the stock to a trust for her children. That is a minority block. The estate tax applies to that which passes at death, not what was *571 owned before death, or what the legatee receives after death. Estate of Bright v. United States, 658 F.2d at 1002; Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987). Decedent should be taxed on assets that were in her gross estate on her estate tax valuation date, August 16, 1982, and not on assets she no longer owned. United States v. Land, 303 F.2d 170, 171-172 (5th Cir. 1962), cert. denied 371 U.S. 862 (1962); see also Ithaca Trust Co. v. United States, 279 U.S. 151 (1929). Decedent no longer owned the two .88 percent blocks of stock given before her death to her children, and so, petitioner concludes, a minority discount should be applied to the block transferred at her death. The question is whether petitioner's reasoning applies here. As simple as petitioner's approach appears, we pause before accepting it. That is because the facts in this case are extreme. Briefly, control was kept in and exercised continuously by the Murphy family, including decedent, followed by her children. Decedent implemented a plan 18 days before her death with the sole and explicit purpose to obtain *572 a minority discount. We are aware of no case where a court has allowed a minority discount in this situation. [1]
We hold that a minority discount is not applicable to the Evening Telegram Company and Television Wisconsin, Inc. stock in these cases. Courts have rejected attempts to avoid taxation of the control value of stock holdings through bifurcation of the blocks. *573 Hamm v. Commissioner, 325 F.2d 934 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Driver v. United States, 38 AFTR 2d 76-6315, 76-2 USTC par. 13,155 (W.D. Wis 1976); Blanchard v. United States, 291 F. Supp. 348 (S.D. Iowa, 1968); Richardson v. Commissioner, a Memorandum Opinion of this Court dated Nov. 30, 1943, affd. 151 F.2d 102 (2d Cir. 1945), cert. denied, 326 U.S. 796 (1945); see also Ahmanson Foundation v. United States, 674 F.2d 761 (9th Cir. 1981); Estate of Curry v. United States, 706 F.2d 1424 (7th Cir. 1981); Northern Trust Co. v. Commissioner, 87 T.C. 349 (1986), affd. sub nom. Citizens Bank & Trust Co. v. Commissioner, 839 F.2d 1249 (7th Cir. 1988); Estate of Pudim v. Commissioner, T.C. Memo. 1982-606. The rationale for allowing a minority discount does not apply because decedent and her children continuously exercised control powers. For example, decedent remained as chairman of the board after the transfer of stock to her children. A minority discount should not be applied if the explicit purpose *574 and effect of fragmenting the control block of stock was solely to reduce Federal tax. Knetsch v. United States, 364 U.S. 361, 367 (1960); Gregory v. Helvering, 293 U.S. 465, 469 (1935). Cases which allow minority discounts and reject family attribution, such as Estate of Bright v. United States, supra, have involved markedly different circumstances, and we believe they are fairly distinguished from this case. We do not apply family attribution in reaching this result, and we believe our result is fully consistent with the 1981 amendments to section 2035. Finally, we believe petitioner's theory, if extended by us to the circumstances here, would be contrary to the policy upon which estate and gift tax unification in 1976 was based. 2. Decedent and Her Children Had Continuous Control Powers A minority discount is appropriate if the block of stock does not enjoy the variety of rights associated with control. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987); *575 Estate of Andrews v. Commissioner, 79 T.C. at 953; see Harwood v. Commissioner, 82 T.C. at 267. To decide whether to apply a minority discount here, we will compare the rights usually associated with control with the rights enjoyed by decedent and passed to her children. In Estate of Newhouse v. Commissioner, 94 T.C. 193, 251 (1990), we said: Control means that, because of the interest owned, the shareholder can unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets. * * * Minority shareholders do not have control power if they are outsiders. See Schroeder v. Commissioner, 13 T.C. 259 (1949). The holder of a minority interest who is an outsider lacks control over corporate policy, cannot direct the payment of dividends, and cannot compel a liquidation of corporate assets. See Harwood v. Commissioner, 82 T.C. at 267; *576 Estate of Andrews v. Commissioner, 79 T.C. at 953. The rights associated with control have been more particularly stated as follows: 1. Elect directors and appoint management. 2. Determine management compensation and perquisites. 3. Set policy and change the course of business. 4. Acquire or liquidate assets. 5. Select people with whom to do business and award contracts. 6. Make acquisitions. 7. Liquidate, dissolve, sell out, or recapitalize the company. 8. Sell or acquire treasury shares. 9. Register the company's stock for a public offering. 10. Declare and pay dividends. 11. Change the articles of incorporation or bylaws. S. Pratt, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, 55-56 (1989). Other than the power to liquidate or sell assets, decedent, and her children thereafter, enjoyed the powers of control. Actual control of stock of the Evening Telegram Company has always been with the Murphy family. Decedent's father-in-law started the business. Decedent's husband inherited and carried on the business holding all shares. Decedent was given a general power of appointment over the marital *577 trust with a control block of Evening Telegram Company stock. She was chairman of the board from 1980 until her death in 1982. In 1975, decedent established a trust for the benefit of her two children with First Bank-North as trustee. She transferred 6.64 percent of the voting stock from the marital trust to each of the trusts for her children. Immediately prior to her two lifetime gifts of .88 percent of the stock (100 shares) to each child, the marital trust had 51.41 percent of the voting stock, the residuary trust had 35.31 percent, and the trusts established by decedent for her children had the remaining 13.28 percent. The trust officer for Firt Bank-North testified that he intended to follow the intentions of the trustors and keep the Evening Telegram stock with the Murphy family. Until the two .88 percent of stock lifetime gifts, the marital trust never had less than 51 percent of the outstanding voting stock. Upon decedent's death, 49.65 percent of stock in the marital trust passed by power of appointment to the two trusts she had established for the children. Each child also held 100 shares (.88 percent) outright and was beneficiary under decedent's husband's residual *578 trust, with 35.31 percent of the stock. During the 18-day period between the lifetime gifts of the stock to decedent's two children and her death, decedent continued to be chairman of the board and her two children held the two top management positions. We believe that all concerned intended nothing of substance to change between the time of transfer and the time of her death, and that nothing of substance did change. 3. Application of a Minority Discount Where a Control Block is Briefly Fragmented for Tax Avoidance Purposes
Numerous cases have denied application of a minority discount where stock is transferred between family members through bifurcated transfers. E.g., Hamm v. Commissioner, 325 F.2d 934 (8th Cir. 1963); Luce v. Commissioner, 4 Cl. Ct. 212 (1983); Blanchard v. United States, 291 F. Supp. 348 (S.D. Iowa, 1968). This is consistent with the established principle that transactions with no purpose or effect other than to reduce taxes are disregarded for Federal tax purposes. *579 Knetsch v. United States, supra at 365; Gregory v. Helvering, supra at 469. Many other cases apply a minority discount, but we believe they are distinguishable as discussed below. In a case involving valuation of stock in a closely held corporation, the taxpayer, for tax avoidance purposes, attempted to fragment a controlling interest into six minority interest blocks. Blanchard v. United States, supra. The taxpayer in Blanchard made six gifts of stock to her grandchildren which she testified were for tax avoidance purposes. Blanchard v. United States, supra at 351. The court found an informal family agreement to sell the stock together. Less than six weeks later, all of the family stock and control of the corporation was sold to a single buyer. The Government valued the gifted stock as a part of a controlling interest. In an action for refund of gift tax, the taxpayer argued that the gift tax was required to be computed with a per-share minority interest applied to the fractional shares. The court held that a fair construction of the applicable section of the Internal Revenue Code "requires *580 that the stock be valued as part of a controlling interest." Blanchard v. United States, supra at 352. The court said: Both before and after the transfers in trust the controlling interest was owned by the family. * * * It is a necessary inference from these facts that so long as the gifted stock was controlled by the family, it had to be valued as a part of a majority interest in the bank. * * * Had it not been sold then, it still would certainly have been held as part of the controlling interest and must be valued as such. * * * Blanchard v. United States, supra at 352. Although the stock was not sold in this case before us, it remains a part of the controlling interest. There was a lifelong commitment and understanding by Morgan and Elizabeth Murphy, and their children, to keep control of the business in the family. The court in Blanchard recognized that the family had an informal agreement to (1) retain control, and (2) to sell the stock only as a controlling block. In this case there was a similar implicit understanding among all concerned to retain control of the business. *581 A minority discount may also be rejected where stock of a closely held corporation is given by the controlling shareholders to their children. Luce v. Commissioner, 4 Cl. Ct. 212 (1983). In Luce, a refund suit for gift taxes paid for gifts by the controlling shareholders of a closely held corporation, the court rejected the application of a minority discount because the applicable market in which the hypothetical willing buyer may be found need not be one which includes the general public. In Luce the taxpayers wanted control of the company to remain in the family and it was their intent that no shares be held by strangers. Minority discounts need not be applied when the transferred stock is part of a family controlling interest. Driver v. United States, 38 AFTR 2d 76-6315, 76-2 USTC par. 13,155 (W.D. Wis 1976); Richardson v. Commissioner, a Memorandum Opinion of this Court dated Nov. 30, 1943. In Driver v. United States, supra, the donor owned all the stock of a family corporation. On December 31, 1968, and January 2, 1969, the donor gave 66 percent of the stock to her nephew and his wife and children. On both *582 days less than 50 percent was given. No one was given as much as 50 percent of the stock. She also gave 14 percent to her sister, and 4 percent to a longtime employee and his wife. She retained 16 percent of the stock for herself. The court treated the gifts made over the two days as consisting of a single gift. In Hamm v. Commissioner, 325 F.2d 934 (8th Cir. 1963), affg. a Memorandum Opinion of this Court, the taxpayers sought to fragment a 100-percent control block of stock and apply a minority discount. Respondent's aggregated valuation was sustained at trial. On appeal, Hamm was decided by the Court of Appeals for the Eighth Circuit, the circuit to which the instant case is appealable. The Eighth Circuit noted that the Tax Court considered a large number of factors in deciding the value of the stock in Hamm, including "the number of outstanding shares of each class of the company's capital stock, and the identity of the shareholders." Hamm v. Commissioner, supra at 938-939 n.1. The Eighth Circuit expressed doubts about the validity of valuing stock as a minority interest when the controlling interest was owned by the family. *583 As noted by Judge (now Justice) Blackmun: If, in view of the over-all complete ownership of the common [stock] by the Hamm family, this minority interest point has any real validity, the foregoing [explanation of the Tax Court's basis for its findings] convincingly demonstrates that the minority interest aspect was considered by the court and that its determination was made as to that specific interest. Hamm v. Commissioner, supra at 941. Minority blocks of stock have been aggregated as components of a single control block where tax avoidance motives exist. Ahmanson Foundation v. United States, 674 F.2d 761 (9th Cir. 1981); Estate of Curry v. United States, 706 F.2d 1424 (7th Cir. 1983); Northern Trust Co. v. Commissioner, 87 T.C. 349 (1986). See also Estate of Pudim v. Commissioner, T.C. Memo. 1982-606. Ahmanson Foundation and Estate of Curry address the potential for abuse if decedent's controlling interests could be fragmented for valuation purposes. In Ahmanson Foundation, decedent owned a controlling interest in a trust that held 100 percent of a corporation, *584 consisting of 100 shares of stock. One share was voting stock while the remaining 99 shares were nonvoting stock. The 99 nonvoting shares were bequeathed to a charitable organization. The sole remaining voting share was bequeathed to a trust in favor of decedent's son. The charitable organization argued that decedent's stock should be bifurcated and valued separately. The Court of Appeals for the Ninth Circuit rejected this approach and held that the stock must be valued as one unit as held in the hands of the estate. Ahmanson Foundation v. United States, supra at 769. Ahmanson Foundation is similar to the case at bar because, in both instances, the plan to transfer control was designed solely to avoid transfer taxation of the controlling interest. Decedents also attempted to obtain a discount for the vast majority of their control block by separating it from a small portion of the control stock. Citing Ahmanson Foundation with approval, the Seventh Circuit Court of Appeals also rejected a fragmentation theory. In *585 Estate of Curry v. United States, supra, an estate valuation refund jury trial case, a taxpayer valued a closely held corporation with the assumption that the voting and the nonvoting stock would be sold separately, even though the estate had 53-percent voting control. The trial court allowed the taxpayer's fragmentation theory to be presented to the jury. It refused to give two jury instructions requested by the Government: (1) the jury must value decedent's nonvoting stock at the same level as voting stock; and (2) the jury may not find a value less than a value that the estate conceded was liquidation value. The court held that fair market value is assessed as the property exists in the hands of the estate rather than fragmented or as it may exist if fragmented through a chain of post-death transactions. Estate of Curry v. United States, supra at 1427. The court stated: Additionally, to permit the hypothetical bifurcation of an otherwise integrated bundle of property for valuation purposes would severely undermine the estate tax system and permit abusive manipulation by inviting an executor to invent elaborate scenarios of disaggregated *586 disposition in order to minimize total value. For example, an estate in possession of all shares of a corporation, voting and non-voting, could, under the regime urged by the estate here, arbitrarily slice the voting share block so thinly as to deny attribution of a control premium to any resulting block. * * * Estate of Curry v. United States, supra at 1428. In Northern Trust Co. v. Commissioner, supra, a gift tax valuation case where the taxpayers had a tax avoidance motive for the transfer of stock in a closely held corporation, we applied a rationale against fragmentation, stating: Given petitioners' concerted estate freeze plan put in place by the simultaneous gifts in trust, we find their attempt to discredit respondent's reliance on Estate of Curry and Ahmanson Foundation to be, with all due respect, disingenuous. Petitioners attempt to draw a distinction based upon the fact that the two cited cases involved the stock of a single majority stockholder, whereas here none were in control. In the context of this case, this is a distinction without a difference, because even petitioners cannot deny that in creating *587 the estate freeze plan they marched in lockstep. So marching, their position was no different than that of a single majority stockholder. Northern Trust Co. v. Commissioner, 87 T.C. at 388. Relying on Ahmanson Foundation v. United States, supra, and Estate of Curry v. United States, supra, we held that value was not affected by the actual transfer of the stock to the trusts. A taxpayer may decrease his taxes, or avoid them altogether by means which the law permits; however, this right is limited by the requirement for some substance to a transaction to support its form. Commissioner v. Estate of Church, 335 U.S. 632 (1949); Helvering v. Hallock, 309 U.S. 106 (1940); Gregory v. Helvering, 293 U.S. 45, 469-470 (1935). The substance over form doctrine was applied in a nonbusiness setting where a taxpayer seeking tax benefits from a personal investment was required to demonstrate that the transaction had some nontax purpose. *588 Knetsch v. United States, 364 U.S. 361, 365 (1960). In Knetsch, the Supreme Court cited Judge Learned Hand's test that a deduction will be disallowed if it does "not appreciably affect [the taxpayer's] beneficial interest except to reduce his tax." Knetsch v. United States, supra at 366 (citing the dissent in Gilbert v. Commissioner, 248 F.2d 399, 411 (2d Cir. 1957)). The same rationale applies in the cases before us. Here, we conclude that decedent's two small lifetime gifts of Evening Telegram Company stock to her children do not appreciably affect decedent's beneficial interest except to reduce Federal transfer taxes. Knetsch v. United States, supra at 367. Although decedent actually transferred two blocks of .88 percent of the stock and reduced her interest to 49.65 percent, we believe that it did not appreciably affect her interest. 4. Minority Discount Cases Distinguished
Cases allowing a minority discount where a family owned a controlling interest generally fall under one or more of the following categories: (1) the transferor did not have control prior to the transfers, *589 Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981); Ward v. Commissioner, 87 T.C. 78 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938 (1982); Estate of Lee v. Commissioner, 69 T.C. 860 (1978); Gallun v. Commissioner, T.C. Memo. 1974-284; (2) the parties agreed that a minority discount was applicable, Harwood v. Commissioner, 82 T.C. 239 (1984); Estate of Piper v. Commissioner, 72 T.C. 1062 (1979); Estate of Heckscher v. Commissioner, 63 T.C. 485, 497 (1975); Martin v. Commissioner, T.C. Memo. 1985-424; (3) tax-motivated transactions were not found; or (4) the transaction preceded gift and estate tax unification in 1976. E.g., Estate of Bright v. United States, supra; Estate of Lee v. Commissioner, supra.
a. Estate of Bright v. United States Distinguished
The instant cases are distinguishable from Estate of Bright v. United States, supra. The issue in Estate of Bright was whether decedent's husband's stock should be attributable to decedent *590 for purposes of determining if the decedent owned a controlling interest. We will first describe Estate of Bright and then explain our grounds for distinguishing it. Mary Bright died in Texas in 1971. Before her death, she held 27.5 percent (an undivided one-half interest of 55 percent) of several closely held corporations as her half of the community property under Texas law. The remaining 45 percent was held by unrelated third parties. Her death terminated the community and the community property was divided. Under her will, her 27.5-percent interest was conveyed to a trust for the benefit of her four children with her husband as trustee. The estate valued her 27.5-percent interest with a minority discount applied. The Government determined that for estate tax purposes, family attribution should apply before the transfer of shares, thereby valuing her share as half of a controlling interest. Under Texas law, either the estate or the surviving spouse had the right to partition the stock. The trial court ordered that family attribution would not apply to decedent's share as a matter of law and that decedent's interest was 27.5 percent. The parties prepared for *591 trial complying with the order. The Government appealed the validity of the trial court's pretrial order relating to control. The Fifth Circuit panel reversed and remanded. The estate's petition for rehearing en banc was granted. The Fifth Circuit en banc vacated the panel opinion and the District Court affirmed, noting that partition would be freely granted due to fungible shares, concluding: Thus, the estate has no means to prevent the conversion of its interest into shares representing a 27 1/2% block, and we conclude that the estate's interest is the equivalent of a 27 1/2% block of the stock. Accordingly, we reject the government's approach of valuing the 55% control block, with its control premium, and then taking one-half thereof. [Citation omitted.] Estate of Bright v. United States, supra at 1001. Since a 27.5-percent block is not a controlling interest, a minority discount was allowed for its stock. The court in Estate of Bright also held that the pre-death relationship between Mr. and Mrs. Bright was irrelevant. *592 Estate of Bright v. United States, supra at 1006. The court affirmed the trial court's ruling to the extent that it defined the interest to be valued as equivalent to 27 1/2% of the stock, to the extent that it excluded as evidence of value the fact that the estate's stock had, prior to decedent's death, been held jointly with Mr. Bright's interest as community property, and the fact that, after death, the particular executor (Mr. Bright) and legatee (Mr. Bright as trustee) was related to another stock holder [sic] (Mr. Bright individually), and to the extent that it excluded any evidence that Mr. Bright, as executor or trustee, would have refused to sell the estate's 27 1/2% block except in conjunction with his own stock and as part of a 55% control block. We hold that family attribution cannot be applied to lump the estate's stock to that of any related party, but rather that the stock is deemed to be held by a hypothetical seller who is related to no one. Estate of Bright v. United States, supra at 1006-1007. *593 Estate of Bright v. United States, supra, is distinguishable from the instant case. i. Estate of Bright Preceded Unification of Transfer Taxes. Mrs. Bright died in 1971, before unification of gift and estate taxes. Thus, the case did not involve a year in which there was a unified transfer tax system, unlike the instant case. See infra paragraph B-5. ii. Minority Interest. In Estate of Bright, decedent's interest was a minority interest. There is no indication Mrs. Bright ever owned more. In contrast, in the instant case, decedent owned a controlling interest almost all of her life following her husband's death. Since Mrs. Bright always had a minority interest, the Commissioner, to oppose a minority discount, needed to attribute Mr. Bright's holdings to Mrs. Bright. In the instant case petitioner argues that respondent must also apply attribution of stock between family members to prevail. We disagree. We do not apply a family attribution theory to reach our result. There is no dispute that decedent had control up until 18 days before her death. We have found that decedent's plan to appear to relinquish control for that *594 brief period lacked substance and economic effect. Accordingly, we disregard the plan to appear to relinquish control for transfer tax purposes, and treat the gift and transfer at death as part of one plan transferring control to decedent's children. This analysis does not rely on family attribution. Attribution is treating stock owned by different persons as if it were owned by one person. It is not necessary to use attribution here because here the transfer of control to decedent's children in two steps in substance is one transaction. Using this analysis, decedent is subject to transfer tax on the control premium without attribution from family members. Accordingly, the Court does not apply a family attribution theory. iii. Lack of Control. The rationale given by courts for allowing a minority discount applies to the Estate of Bright case, but does not apply to the instant case. In Estate of Bright, there is no indication that any member of the Bright family was employed in the business. The Fifth Circuit did not indicate whether the Bright family exercised powers of control, such as possessing key management positions, in contrast with the instant case. *595 In the instant case, there was also a clear understanding between decedent, her children, and the trustee to maintain family control of the corporation. In Estate of Bright, control of the corporation did not disappear for Federal transfer tax purposes, then reappear in the hands of target parties. At issue in Estate of Bright was the characterization and value of property following death. iv. No Tax Avoidance Purpose. The sole purpose of the transaction in the instant case was tax avoidance. That advice was given by Mr. Randy, and implemented. The explicit plan was to transfer .88 percent of the stock to each of the children to make it appear that control had temporarily disappeared. This had no intended effect or purpose other than the anticipated tax savings. There was no comparable tax avoidance plan described by the court in Estate of Bright. b. Other Cases Distinguished
Several other cases follow Estate of Bright v. United States, supra, or are consistent with it and are distinguished from the instant cases on one or more of the same grounds. The court in Estate of Bright agreed with our holding in *596 Estate of Lee v. Commissioner, 69 T.C. 860 (1978). Estate of Lee was also a community property case where the Government argued that decedent's spouse's stock should be attributed to decedent for purposes of determining if decedent owned a controlling interest. Mrs. Lee died in the State of Washington in 1971 survived by her husband and three adult children. We held that decedent's interest was 40 percent of the common stock and 50 percent of the preferred stock of the corporation. Respondent argued family attribution under Washington community property laws. Mrs. Lee did not have control of the closely held corporation before the transfer. Estate of Lee is inapplicable to the instant case for the same reasons that Estate of Bright does not apply. The taxpayer in Estate of Lee did not have control in her own right. Also, the court did not find any tax avoidance motive. The case also involved a year before transfer tax unification. In Estate of Andrews v. Commissioner, 79 T.C. 938 (1982), the taxpayer never owned control in his own right. Mr. Andrews died in 1975 owning about 20 percent of four closely held corporations with *597 his two brothers and two sisters owning the remaining 80 percent. The Government argued that no minority discount should apply because "all shareholders in the four corporations, including decedent, shared in control." We rejected the pre-death family attribution theory and applied a minority discount. In Ward v. Commissioner, 87 T.C. 78 (1986), a gift tax valuation case, the husband and wife never separately owned control of a closely held corporation. The Government sought to attribute stock of one spouse to the other and to deny a minority discount. In Ward, the taxpayer husband purchased a ranch in Florida and deeded it in 1978 to a newly formed closely held corporation. Husband and wife each received 43.7 percent of the stock. Their three sons each received 4.2 percent of the stock in exchange for cattle and depreciable assets contributed to the corporation. In each of three subsequent years, husband and wife made gifts of minority stock interests to each oftheir three sons as a part of their estate plan. The taxpayers intended that the ranch continue operating as a single economic unit after their deaths. We rejected the Government's attempt to apply *598 family attribution. In Ward, the taxpayers did not begin with individual control. Only when viewed together did the husband and wife have control. Thus, Ward is distinguishable from the instant case because the taxpayers in Ward did not fragment a controlling block of stock with an anticipated result of complete avoidance of Federal transfer tax liability on the premium associated with control. In Minihan v. Commissioner, 88 T.C. 492 (1987) (Court reviewed), four parties apparently owned a 33.6-percent, 29.4-percent, 25.2-percent, and 11.8-percent proportionate interest, respectively, in a corporation. In 1981, they sold the stock to separate trusts for their families. The Commissioner apparently characterized the transactions as gifts and valued the gifts with a control premium by aggregating the holdings of the four parties. The Government conceded all issues, and the taxpayers sought reasonable litigation costs. We concluded that the Commissioner's reliance on aggregation was unreasonable. *599 Minihan v. Commissioner, supra at 500. As stated, all of the cases following Estate of Bright are distinguishable from the instant case for the same reasons that Estate of Bright is distinguishable, except that Ward and Minihan involve post transfer tax unification years. A few pre-1976 cases do not squarely fit into the three general areas for applying minority discounts. Drybrough v. United States, 208 F. Supp. 279 (W.D. Ky. 1962); Whittemore v. Fitzpatrick, 127 F. Supp. 710 (D. Conn. 1954); Obermer v. United States, 238 F. Supp. 29, 34 (D. Hawaii 1964). These cases were decided before unification of gift and estate taxes in 1976. As discussed supra at paragraph 5(a), we believe gift and estate tax unification showed congressional intent that all property be subject to relatively uniform transfer taxes, which may be undermined if owners of control may pass it to their relatives by using transactions structured to avoid transfer taxation of the control premium. 5. Legislative History of the Gift and Estate Tax
Petitioner and respondent both make arguments based on the legislative *600 history of the gift and estate tax. Petitioner argues that valuing the stock for estate and gift tax purposes with the premium associated with control of the business would constitute reenactment of section 2035. Petitioner also points out that Congress has considered and rejected provisions that would restrict application of minority discounts, and argues that should be taken as a rejection of respondent's position by Congress. Respondent argues that allowance of a minority discount to petitioner is contrary to congressional intent in enacting unification of estate and gift taxes in 1976. The Federal estate tax was enacted in 1916, and a permanent gift tax was enacted in 1932. Prior to 1976, the burden imposed on most lifetime gifts was substantially less than the burden imposed on transfers at death. Rules to discourage "gifts in contemplation of death" arose as a by-product, and are discussed below. (a) Unification of Gift and Estate Taxes in 1976. The Tax Reform Act of 1976 "unified" estate and gift taxes. Pub. L. 94-455, secs. 2001-2010, 90 Stat. 1520. Congress intended to largely eliminate the disparity between gift tax and estate tax, and to unify them into *601 a fully integrated system by "elimina[ting] ways by which estate planners can reduce the estate and gift tax burden through special patterns of transferring their property." H. Rept. 94-1380 (1976), 1976-3 C.B. (Vol. 3) 735, 741. The unified system imposes Federal estate and gift taxes based on a single unified rate schedule applied to a donor/decedent's cumulative inter vivos transfers and transfers at death (secs. 2001, 2012, 2501, and 2502), and a unified credit applicable to a donor/decedent's cumulative gift tax and estate tax liabilities. Secs. 2010 and 2505. Some limited advantages to lifetime giving remained, such as (1) the availability of an annual gift tax exclusion of $ 3,000 per donee (raised to $ 10,000 in 1981), sec. 2503(b), and (2) the fact that appreciation of property from the time the gift is made to the date of death is removed from the transfer tax base. We discussed the legislative history of the unified transfer tax system enacted by the Tax Reform Act of 1976 in Estate of Sachs v. Commissioner, 88 T.C. 769 (1987), affd. in part and revd. in part *602 856 F.2d 1158 (8th Cir. 1988). The issue in Estate of Sachs was whether a gift tax paid by a donee on a gift made within three years of the donor/decedent's death was includable in the donor/decedent's gross estate under the "gross up" provisions of section 2035(c). The literal language of section 2035(c) did not require the inclusion of gift taxes paid by a donee. Nonetheless, we held that the gift tax was includable in the donor's gross estate. This holding was based upon the intent of Congress to equalize the treatment of deathbed transfers and transfers at death. We explained: Insistence on the literal language of section 2035(c) would distort the framework erected by the Tax Reform Act of 1976. The act retained some of the prior law's preferences for lifetime gifts; however, these preferences were not made available to deathbed gifts. Petitioners' construction of section 2035(c) extends the benefit of one such preference to deathbed net gifts. Mechanical application of section 2035(c) would completely remove from the transfer tax base all funds used to pay gift tax on such gifts. This interpretation of the statute is wholly inconsistent with Congress' goal *603 of sharply distinguishing deathbed gifts from other gifts and eliminating the disparity of treatment between deathbed gifts and transfers at death. Estate of Sachs v. Commissioner, supra at 777. Decedent owned and enjoyed control of the Evening Telegram Company. She did not transfer the stock that brought her below 50 percent of the outstanding stock until shortly before her death. The two lifetime gifts of .88 percent of stock (100 shares each) shortly before her death were an attempt to keep from being taxed on the value of the controlling interest in the corporation which she owned for a significant part of her life. Decedent's design was to appear to relinquish control of the corporation for Federal transfer tax purposes, but never in fact to have it leave the hands of her family. We believe that decedent's plan is inconsistent with the unified transfer tax enacted in 1976. Gregory v. Helvering, 293 U.S. 465, 469 (1935). (b) Effect of 1981 Amendments to Gift in Contemplation of Death Rule. We next consider petitioner's argument that disallowance of a minority discount is inconsistent with changes made to section 2035 in *604 1981. As indicated above, prior to 1976 the burden imposed on most lifetime gifts was lower than on transfers at death. As a result, rules were enacted to discourage estate tax avoidance by making gifts shortly before death. Prior to 1977, gifts made within three years of death were rebuttably presumed to have been made in contemplation of death. These gifts were said to be "in contemplation of death," and were included in decedent's estate if the presumption was not overcome. Sec. 2035. In 1976, Congress removed the rebuttable presumption and provided for automatic inclusion in decedent's estate of all gifts made within three years of death, regardless of motivation. Tax Reform Act of 1976, Pub. L. 94-455, tit. XX, sec. 2001(a)(5), 90 Stat. 1520, 1848. Overall, however, as a result of unification of gift and estate taxes in 1976, there was much less need for a gift in contemplation of death rule. As a result, in 1981, the three-year gift in contemplation of death rule was sharply narrowed. Petitioner concedes that, but for the 1981 amendments, the stock transferred to decedent's children would have been automatically included in her estate. Petitioner's position here, *605 however, is that the 1981 amendments to section 2035 make petitioner eligible for a minority discount -- and to escape transfer taxation of the control value -- by allowing decedent to split the gift of control into a lifetime gift and a testamentary bequest. We disagree. The Ways and Means Committee in its report on Economic Recovery Tax Act, stated that: Under the unified transfer tax system adopted in the Tax Reform Act of 1976, the inclusion in the gross estate of gifts made within 3 years of death generally has the effect of including only the property's postgift appreciation in the gross estate * * *. The committee believes that inclusion of such appreciation [187] generally is unnecessary except for gifts of life insurance and certain property included in the gross estate pursuant to certain of the so-called transfer sections (secs. 2036, 2037, 2038, 2041, and 2042). * * * H. Rept. 97-201, 186-187 (1981), 1981-2 C.B. 352, 390; Estate of Slater v. Commissioner, 93 T.C. 513, 519 (1989). This shows that the Ways and Means Committee intended to no longer tax the post-gift appreciation. However, we see no basis in the statute or legislative *606 history for petitioner's view that Congress intended the control premium to escape transfer taxation because of the 1981 amendments to section 2035. The three-year gift in contemplation of death rule was retained for property included in the gross estate pursuant to the transfer sections, such as section 2036. Under section 2036(a)(1), property is included in decedent's estate to the extent decedent retained the actual possession or enjoyment thereof. This applies even though decedent had no enforceable right to such possession or enjoyment. Guynn v. United States, 437 F.2d 1148 (4th Cir. 1971); Estate of McNichol v. Commissioner, 265 F.2d 667 (3d Cir. 1959), affg. 29 T.C. 1179 (1958), cert. denied 361 U.S. 829 (1959); Estate of Honigman v. Commissioner, 66 T.C. 1080, 1082 (1976); Estate of Linderme v. Commissioner, 52 T.C. 305, 308 (1969). Here, we have found that decedent enjoyed the power of control until her death. At the time of the lifetime gifts to her children, decedent and her children did not want anything to change. Decedent and the children kept the same corporate positions. *607 Both children, the trustee, and Mr. Randy testified that they would follow decedent's desire to keep all stock within the family. Decedent was told that she would own only 49 percent; however, an estate planning memo provided, "Under the first alternative even though she will have a minority interest at the level of 49% she and the bank or she and the children will have control of the corporation." However, neither party raised the section 2036(a)(1) issue, and we do not reach it. (c) Prior Legislative Consideration of Minority Discounts. Petitioner argues that legislative proposals dealing with attribution of stock ownership and minority discounts have been considered, but not enacted; and that we should infer from this that respondent's position has been rejected by the Congress. In November 1984, the Treasury Department submitted a report to the President entitled "Tax Reform for Fairness, Simplicity, and Economic Growth." It stted that transfer tax saving opportunities continue to be available for lifetime gifts, and that "Minority or fractional share discounts enable taxpayers to structure transfers so as to reduce the aggregate value of property brought within the *608 transfer tax base." Tax Reform for Fairness, Simplicity, and Economic Growth, Vol. 2 at 376, 381. The following was proposed to the President: The value for transfer tax purposes of a fractional interest in any asset owned, in whole or in part, by a donor or decedent would be a pro rata share of the fair market value of that portion of the asset owned by the donor or decedent. Prior gifts of fractional interests in the asset, as well as any fractional interests in the asset held by the transferor's spouse, would be attributed to the donor or decedent for purposes of determining the value of the fractional interest transferred. * * * Tax Reform for Fairness, Simplicity, and Economic Growth, Vol. 2 at 387. The President's tax reform proposals to the Congress for Fairness, Growth and Simplicity, made in May 1985, did not include this proposal. In 1987 the House of Representatives passed a variation of this proposal as part of the Omnibus Budget Reconciliation Act (OBRA), H. Rept. 100-391 (II), at 1041-1042 (1987). In describing its provision, the Ways and Means Committee said, "numerous courts have found that * * * minority blocks of stock are worth less than a proportionate *609 share of the value of corporate assets," citing Ward v. Commissioner, 87 T.C. 78 (1986), as an example. H. Rept. 100-391 (II), supra at 1042. The Committee also said, "Courts have allowed a minority discount even where related persons together own a majority interest," citing Estate of Bright v. United States, supra.H. Rept. 100-391 (II), supra at 1042. As its reasons for change, the Ways and Means Committee said: The assignment of a discount to minority ownership of an enterprise assumes that the owners of that enterprise have adverse interests. The Committee believes that such an assumption is less defensible incorrect [sic] when the owners are related. H. Rept. 100-391 (II), supra at 1042. The House Bill included a provision that -- (1) The value of stock in a corporation is deemed to be equal to its pro rata share of all the stock of the same class in the corporation, unless a different value is established by clear and convincing evidence. * * * H. Rept. 100-391 (II), supra at 1043. The Committee believed that this change in the burden of proof would reduce the number of situations in which *610 the value of corporate stock is found to be different than its pro rata share of the underlying assets. H. Rept. 100-391 (II), supra at 1043. In determining whether a different value can be established under the clear and convincing evidence standard, all stock held, directly or indirectly, by an individual or by members of such individual's family is treated as held by one person. Thus, a minority discount will not be appropriate for transfers between family members unless all the stock held by that person or the person's family would qualify for the discount. H. Rept. 100-391 (II), supra 1043. The above proposals passed the House of Representatives in 1987, but were not included in the Senate Bill or the conference report for OBRA. H. Rept. 100-495 (Conf.), at 994-995 (1987), 1987-3 C.B. 193, 247-248. The House proposal would have reversed the line of cases it cites, such as Estate ofWard v. Commissioner, supra, and Estate of Bright v. United States, supra. Petitioner asks us to read Congress' failure to enact the proposal as Congress' blessing of that line of cases. Even if we did that, it does *611 not dispose of the issue before us because our holding is not inconsistent with those cases, which we have distinguished above. Failure to enact a proposal is speculative at best as a guide to interpretation of law. We do not read these developments as a showing that Congress would want the extreme cases before us to be decided differently. 6. Valuation of Nonvoting Stock
Petitioner seeks to value the voting and nonvoting stock of the Evening Telegram Company differently by applying a discount to the nonvoting stock. Because we have treated decedent's holdings as a control block for valuation purposes, we apply the rule stated in Estate of Curry v. United States, 706 F.2d 1424 (7th Cir. 1983), that where the voting and nonvoting stock are enhanced by being held together, they are to be valued together for Federal estate tax purposes. Estate of Curry v. United States, supra at 1429-1430. Thus, the voting and nonvoting common stock are valued the same. Accordingly, the value of 16,240 shares of nonvoting stock on August 16, 1982, was $ 660 per share as discounted for lack of marketability and liquidation. To reflect concessions, *612 Decisions will be entered under Rule 155. Footnotes
*. indicates Mr. Randy's publishing subtotal.↩
**. indicates Mr. Cate's interpretation of Mr. Hurlbut's publishing subtotal.↩
1. Commentators writing about the potential for abuse of transfer of control of a closely held corporation without paying Federal transfer taxes have noted, "No court has considered whether a minority discount is permissible when the transfer of the minority interest gives the donee a majority interest in and control of the corporation." Fellows and Painter, "Valuing Close Corporations for Federal Wealth Transfer Taxes: A Statutory Solution to the Disappearing Wealth Syndrome," 30 Stan. L. Rev. 895, 898↩ n.13 (1978) .